UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
In re

ALLOU DISTRIBUTORS, INC., et al.,                    Chapter 7
                                                     Case No. 03-82321-ess
                          Debtors.                   (Substantively Consolidated)
---------------------------------------------------------------x
KENNETH P. SILVERMAN, as Chapter 7
Trustee of ALLOU DISTRIBUTORS, INC., et al.,
and LASALLE BUSINESS CREDIT, LLC,

                          Plaintiffs,

           -against-                                 Adv. Pro. No. 04-8384-ess

KPMG LLP, ARTHUR ANDERSEN LLP, and
MAYER RISPLER & COMPANY, P.C.,

                          Defendants.
---------------------------------------------------------------x

## MEMORANDUM DECISION ON MOTIONS TO DISMISS
## THE THIRD AMENDED COMPLAINT

Appearances:

Anthony C. Acampora, Esq.                 Kevin A. Burke, Esq.
Ronald J. Friedman, Esq.                  Howrey LLP
Jay S. Hellman, Esq.                      Attorneys for KPMG LLP
Silverman & Acampora LLP                  Citigroup Center
Attorneys for the Chapter 7 Trustee       153 East 53rd Street
100 Jericho Quadrangle                 New York, NY 10022
Jericho, NY 11743
                                          Matthew I. Kliegman, Esq.
Richard G. Haddad, Esq.                   Alan Raylesberg, Esq.
Anthony M. Piccione, Esq.                 Chadbourne & Parke LLP
Erin E. Wietecha, Esq.                    Attorneys for Arthur Andersen LLP
Otterbourg, Steindler, Houston & Rosen, P.C.   30 Rockefeller Plaza
Attorneys for LaSalle Business Credit, LLC   New York, New York 10122
230 Park Avenue
New York, NY 10169                        Steven A. Coploff, Esq.
                                          Steinberg & Cavaliere, LLP
                                          Attorneys for Mayer Rispler & Company
                                          50 Main Street
                                          White Plains, NY 10606

**HONORABLE ELIZABETH S. STONG**

**UNITED STATES BANKRUPTCY JUDGE**

Before the court are the motions (the "Motions to Dismiss") of defendants KPMG LLP ("KPMG"), Arthur Andersen LLP ("Andersen"), and Mayer Rispler & Company, P.C. ("Mayer Rispler") (collectively, the "Defendants") to dismiss with prejudice the third amended complaint dated June 30, 2006 (the "Third Amended Complaint" or "TAC"), filed by the plaintiffs Kenneth P. Silverman, as Chapter 7 trustee of Allou Distributors, Inc. (the "Trustee"), and LaSalle Business Credit, LLC, as agent ("LaSalle") (collectively, the "Plaintiffs").  By their Third Amended Complaint, the Plaintiffs allege that each Defendant committed malpractice and fraud through their gross negligence and failure to detect the fraud committed by the Debtors' principals during their respective audit years.  The Trustee also alleges that Andersen and Mayer Rispler committed malpractice in the years in which they participated in the audit work but did not issue an audit report.

The Defendants bring these Motions to Dismiss pursuant to Rules 9(b), 12(b)(1), and 12(b)(6) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rules 7009 and 7012 of the Federal Rules of Bankruptcy Procedure.  The Defendants argue that the Plaintiffs do not state claims upon which relief can be granted and do not plead fraud with the particularity required by Rule 9(b).  Andersen and Mayer Rispler also argue that the Trustee does not have standing to bring this adversary proceeding.

<u>Jurisdiction</u>

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(1).

<u>Background</u>

<u>The Debtors' Bankruptcy Cases</u>

On April 9, 2003, involuntary Chapter 11 petitions were filed against Allou Distributors, Inc. ("ADI"), and three of its affiliates, M. Sobol, Inc. ("Sobol"), Direct Fragrances, Inc. ("Direct Fragrances"), and Stanford Personal Care, Inc. ("Stanford") (the "Original Debtors"), by Congress Financial Corporation ("Congress"), Citibank, N.A. ("Citibank"), and LaSalle.  Case No. 03-82321, Docket No. 1; Case No. 03-82323, Docket No. 1; Case No. 03-82324, Docket No. 1; Case No. 03-82325, Docket No. 1.  The Original Debtors consented to entry of orders for relief under Chapter 11, and on April 10, 2003, the Court issued orders for relief in each of the Original Debtors' Chapter 11 cases.  Case No. 03-82321, Docket Nos. 3, 4.  The Original Debtors are wholly owned subsidiaries of Allou Health Care, Inc. ("AHI"), a publicly traded Delaware corporation.  On April 18, 2003, Congress, Citibank, and LaSalle filed an involuntary Chapter 11 petition against AHI, and by consent order entered on July 14, 2003, the Court entered an order for relief.  Case No. 03-82662, Docket No. 63.

On April 18, 2003, Congress, Citibank, and LaSalle filed involuntary Chapter 11 petitions against two of ADI's six subsidiaries, Trans World Grocers Inc. ("Trans World"), and Rona Beauty Supplies, Inc. ("Rona Beauty").  Case No. 03-82660, Docket No.1; Case No. 03-82661, Docket No. 1.  On May 1, 2003, the Court entered orders for relief in the Chapter 11 cases of Trans World and Rona Beauty (the "Subsequent Debtors").  Case No. 03-82660, Docket No. 9; Case No. 03-82661, Docket No. 9.

On April 25, 2003, voluntary Chapter 11 petitions were filed on behalf of ADI's four remaining subsidiaries, namely, Core Marketing, Inc. ("Core"), HBA Distributors, Inc. ("HBA Distributors"), HBA National Sales Corp. ("HBA National Sales"), and Pastel Cosmetic &

Beauty Aids, Inc. ("Pastel") (the "Voluntary Debtors"). Case No. 03-82838, Docket No. 1; Case

No. 03-82840, Docket No. 1; Case No. 03-82841, Docket No. 1; Case No. 03-82839, Docket No.

1. AHI, the Original Debtors, the Subsequent Debtors, and the Voluntary Debtors are

collectively referred to as the "Debtors" or "Allou."

By order dated September 16, 2003, the Debtors' Chapter 11 cases were converted to

cases under Chapter 7 of the Bankruptcy Code. Case No. 03-82321, Docket No. 583. Kenneth

P. Silverman was appointed as the Chapter 7 trustee. *Id*. The Debtors' cases were substantively

consolidated by order dated December 22, 2003. Case No. 03-82321, Docket No. 923.

<u>The Debtors' Principals</u>

Victor Jacobs and his sons Herman Jacobs and Jacob Jacobs (the "Jacobs") held

approximately 61 percent of the voting stock of AHI. TAC ¶ 28. Victor was chairman of AHI,

Herman was chief executive officer of AHI, and Jacob was executive vice president of AHI, and

each also served on AHI's board of directors. TAC ¶ 29. On June 30, 2003, involuntary Chapter

7 bankruptcy petitions were filed against Victor Jacobs, Herman Jacobs, and Jacob Jacobs. TAC

¶ 166. Orders for relief were entered on September 9, 2003, and Allan B. Mendelsohn was

appointed as the Chapter 7 trustee. TAC ¶ 171.

<u>The Defendants and the Audits</u>

Mayer Rispler served as Allou's independent auditor from 1990, when Allou issued

shares to the public, until June 14, 2001. TAC ¶ 127. Thereafter, Mayer Rispler served as

Allou's internal auditor. *Id*. Mayer Rispler issued an unqualified audit report dated June 19,

2000 (the "2000 Audit") on Allou's consolidated balance sheets as of March 31, 2000, and

March 31, 1999, and the related consolidated statements of income, stockholders' equity, and

cash flows for each of the years in the two-year period ending March 31, 2000 (the "2000

Financial Statements"). TAC ¶ 130.

Andersen replaced Mayer Rispler as Allou's independent auditor from June 14, 2001,

until June 10, 2002. TAC ¶ 131. Andersen issued an unqualified audit report on or about July 2,

2001 (the "2001 Audit") on Allou's consolidated balance sheet as of March 31, 2001, and the

related consolidated statements of income, stockholders' equity, and cash flows for the fiscal

year ending March 31, 2001 (the "2001 Financial Statements"). TAC ¶ 132. Andersen also

participated in the audit for the fiscal year ending March 31, 2002. TAC ¶¶ 131, 310, 314-22,

326, 351-52.

KPMG replaced Andersen as Allou's independent auditor in June 2002. TAC ¶ 134.

KPMG issued an unqualified audit report on or about July 3, 2002 (the "2002 Audit") on Allou's

consolidated balance sheet as of March 31, 2002, and the related consolidated statements of

income, stockholders' equity, and cash flows for the year ending March 31, 2002 (the "2002

Financial Statements"). TAC ¶ 136.

<u>Procedural History</u>

The Plaintiffs commenced this adversary proceeding on June 14, 2004, by filing a

complaint against KPMG, Andersen, and Mayer Rispler. Docket No. 1. On August 26, 2004,

the Plaintiffs filed an amended complaint (the "Amended Complaint") which substituted LaSalle

for Congress as the agent authorized to prosecute this action on behalf of the Lenders, as defined

below. Docket No. 23.

On September 24, 2004, KPMG, Andersen, and Mayer Rispler moved to dismiss the

Amended Complaint on grounds that the Amended Complaint did not state a claim upon which

relief could be granted and that, under *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991) (the "*Wagoner* rule"), the Trustee did not have standing to sue. Docket Nos. 28, 30, 32. These issues were bifurcated and the Defendants' challenge to the Trustee's standing was heard first. Docket No. 56. On May 26, 2005, former Judge Melanie Cyganowski granted the Defendants' motions and dismissed without prejudice the Trustee's claims for lack of standing. Docket Nos. 56, 59. The Plaintiffs were granted leave to replead, and on September 6, 2005, the Plaintiffs filed a second amended complaint (the "Second Amended Complaint"). Docket Nos. 59, 63.

On October 27, 2005, and October 31, 2005, the Defendants moved to dismiss the Second Amended Complaint on grounds that it did not state a claim upon which relief could be granted and that, under the *Wagoner* rule, the Trustee did not have standing. Docket Nos. 65, 68, 71. These issues were again bifurcated, and on January 30, 2006, the Court heard the Defendants' challenge to the Trustee's standing. Docket No. 87. The Court denied the Defendants' motion to dismiss the Second Amended Complaint with respect to question of the Trustee's standing. Docket Nos. 87, 93. The Court found that the "amended pleading has been sufficiently pled to deal with the so-called adverse interest exception of the *Wagoner* Rule." Docket No. 87 (transcript of January 30, 2006, hearing, at 57:1-4).

On March 30, 2006, the Court heard the balance of the Defendants' motions to dismiss the Second Amended Complaint. Docket No. 102. On May 16, 2006, the Court granted the Defendants' motions and dismissed without prejudice the Trustee's claims for failure to state a claim upon which relief could be granted. Docket Nos. 103, 105. The Plaintiffs were granted leave to replead, and on June 30, 2006, the Plaintiffs filed the Third Amended Complaint.

5

Docket No. 106.

On August 7, 2006, the Defendants moved to dismiss the Third Amended Complaint. Docket Nos. 109, 117, 120.  On October 31, 2006, the Court, by Judge Cyganowski, heard these motions.  Docket No. 131.  On February 28, 2007, before a decision was rendered on the Motions to Dismiss, this adversary proceeding was reassigned to Honorable Elizabeth S. Stong. Docket No. 132.  This Court heard the Motions to Dismiss at hearings at which counsel for the Plaintiffs and counsel for the Defendants appeared and were heard, and the motions were submitted for decision on April 28, 2008.  Docket No. 137.  After consideration of the submissions and arguments of counsel, and for the reasons set forth below, the Motions to Dismiss are denied.

The Third Amended Complaint

The Plaintiffs allege that this adversary proceeding arises out of a "long-running fraudulent scheme" by the Jacobs through which they manipulated Allou's reported accounts receivable and inventory and engaged in other wrongful conduct "to loot the company of its assets" and "enrich themselves and their friends and relatives, and enhance their standing within their community."  TAC ¶ 1.  The Third Amended Complaint states that each Defendant committed malpractice and fraud by being grossly negligent and/or reckless in failing to detect the fraud committed by the Jacobs during their respective audit years.  TAC ¶¶ 392, 394, 397, 413, 421-50.  The Trustee also alleges that Andersen and Mayer Rispler committed malpractice during the fiscal years in which they participated in the audit work but did not issue an audit report.  TAC ¶¶ 425-27 (Andersen (fiscal year 2002)); TAC ¶¶ 428-30 (Mayer Rispler (fiscal year 2002)); TAC ¶¶ 435-37 (Mayer Rispler (fiscal year 2001)).

6

The Plaintiffs allege that the Defendants' "representations in their audit opinions that their examinations of Allou's financial statements were performed in accordance with GAAS and that Allou's financial statements presented fairly, in all material respects, the financial position, results of operations, and cash flows of Allou in accordance with GAAP, were materially false and misleading." TAC ¶ 15.

The Third Amended Complaint states that these fraudulent misstatements appeared in Allou's consolidated financial statements, were incorporated in Allou's public filings with the Securities and Exchange Commission, and were provided to lenders by Allou in connection with the extension of hundreds of millions of dollars in credit and other financial accommodations. TAC ¶¶ 2, 3. The Plaintiffs allege that because of the Defendants' "failure (a) to conduct appropriate audits under GAAS, (b) to conduct themselves in accordance with professional standards, and (c) to perform their obligations to Allou, Allou's independent officers, directors, shareholders and attorneys were not advised of Allou's questionable and improper activities and conduct." TAC ¶ 18. The Plaintiffs also allege that "[i]f Allou's independent officers, directors, shareholders and attorneys had been advised of Allou's improper activities and conduct, they could have, and would have, stopped Allou's improper activities and conduct." TAC ¶ 19. The Plaintiffs allege that Allou, LaSalle, and the other lenders have sustained damages as a result of the Defendants' "gross negligence and/or reckless indifference as to whether or not the financial statements were free from material misstatement". TAC ¶¶ 20, 21.

The Plaintiffs assert nine claims for relief in the Third Amended Complaint. The First through Sixth Claims for Relief are asserted by the Trustee for malpractice. The Trustee alleges that the Defendants committed malpractice in failing to detect the Jacobs' alleged fraud during

their audit years, and that Andersen and Mayer Rispler committed malpractice during the years in which they did not issue an audit opinion but participated in the audit work. TAC ¶¶ 421-41. The Seventh through Ninth Claims for Relief are asserted by LaSalle for fraud and are predicated upon alleged acts of gross negligence and recklessness of each Defendant in performing their audits. TAC ¶¶ 442-50. The Plaintiffs allege that if KPMG, Andersen, and Mayer Rispler "had properly performed their professional services, Allou would have discovered the Jacobs' fraudulent activities and could have prevented or reduced the amounts looted by the Jacobs and the losses sustained as a result thereof." TAC ¶ 248.

<u>The Allegations of the Third Amended Complaint</u>

The following is a summary of certain of the allegations in the Third Amended Complaint, which are assumed to be true solely for purposes of deciding these Motions to Dismiss. *See ATSI Commc'n, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005).

*<u>The Loans to Allou</u>*

Before these bankruptcy cases were filed, the Debtors were distributors of health and beauty products, pharmaceuticals, fragrances, and cosmetics. TAC ¶ 27. Pursuant to a Loan and Security Agreement dated September 4, 2001 (the "Loan Agreement"), the Lenders made loans and advances and provided other financial accommodations to ADI, Sobol, Stanford, and Direct Fragrances (the "Borrowers") in an amount up to $200 million on a revolving basis. TAC ¶ 137. The Borrowers were permitted to borrow funds up to an amount equal to 85 percent of eligible accounts receivable plus 60 percent of eligible inventory. TAC ¶ 139. To secure payment of the

obligations to the Lenders, the Borrowers granted the Lenders a security interest and lien upon all of their personal property, including inventory, accounts receivable, and general intangibles, whether existing or thereafter acquired.  TAC ¶ 140.  The Borrowers' indebtedness under the Loan Agreement was guaranteed by AHI, HBA National Sales, HBA Distributors, Pastel, Rona Beauty, and Trans World.  TAC ¶ 138.  In addition, the Jacobs personally guaranteed $10 million of the Borrowers' indebtedness.  *Id.*

Pursuant to the Loan Agreement, the initial lenders, Citibank and Congress, loaned a total of $178,627,624.83 to Allou as of September 4, 2001, by paying that amount to Allou's prior secured lender, Fleet National Bank.  TAC ¶ 141.  Before making the loan, Citibank and Congress received Allou's 2000 Financial Statements, 2000 Audit, 2001 Financial Statements, and 2001 Audit.  TAC ¶ 142.  The Plaintiffs allege that in deciding whether to enter into the Loan Agreement, Citibank and Congress reasonably relied upon these documents.  TAC ¶ 143.

In September and October 2001, Dime Commercial Corp., Siemens Financial Services, Inc., Orix Business Credit, LaSalle Business Credit, Inc.,[1] Webster Bank, Bank Leumi USA, and Guaranty Business Credit Corp. (the "Subsequent Lenders") purchased and assumed an interest in the benefits and obligations under the Loan Agreement (the "Assignments").  TAC ¶ 144. The Plaintiffs allege that in deciding whether to enter into the Assignments, each Subsequent Lender reasonably relied upon the 2000 Financial Statements, the 2000 Audit, the 2001 Financial Statements, and the 2001 Audit.  TAC ¶ 146.

*The Jacobs' Alleged Fraudulent Scheme*

---

[1]  The Third Amended Complaint states that Plaintiff LaSalle Business Credit, LLC, is the successor by merger to LaSalle Business Credit, Inc.  TAC ¶ 144(d).

The Plaintiffs identify several frauds committed by the Jacobs (the "Component Frauds"), as follows.  First, the Plaintiffs allege that the Jacobs falsely inflated Allou's accounts receivable and inventory by creating fictitious accounts receivable and inventory on the books of the Allou entities.  TAC ¶¶ 174-92.  Second, the Plaintiffs allege that the Jacobs diverted cash collections of the Allou entities to themselves.  TAC ¶¶ 195-210.  Third, the Plaintiffs allege that the Jacobs misappropriated funds through fictitious lease transactions.  TAC ¶¶ 211-37.  And finally, the Plaintiffs allege that the Jacobs diverted funds through fraudulent transfers to third parties, including friends, relatives, and associates of the Jacobs as well as businesses and entities affiliated with or related to the Jacobs.  TAC ¶¶ 238-44.

Fictitious Accounts Receivable and Inventory  The Plaintiffs allege that the Jacobs fraudulently inflated Allou's accounts receivable balances by creating tens of millions of dollars of fictitious invoices showing sales by a fictitious "Salesman Number 2" to customers including WalMart, Sears, and J.C. Penney.  TAC ¶ 176.  More than $220 million, or some 40 percent, of Allou's total sales from January 2000 through March 2003 was attributed to "Salesman Number 2."  TAC ¶ 178.  The Jacobs made it appear that Allou received payment on these fictitious invoices by issuing checks to Allou from Jacobs-related entities in payment of the invoices.  TAC ¶ 179.  For example, fictitious invoices to Sears were paid, in part, by S.E. Roebuck Limited, a Jacobs-related entity, when no sale had been made and no product had been delivered.  TAC ¶ 180.  Allou recorded some $220 million in fictitious sales from January 2000 through March 2003.  TAC ¶ 177-78.  Allou also recorded millions of dollars of fictitious purchases by Allou from companies affiliated with or controlled by the Jacobs, resulting in artificial inflation of Allou's inventory balances.  TAC ¶ 185.

Diversion of Cash Collections  The Plaintiffs allege that the Jacobs "diverted millions of dollars of cash belonging to Allou to themselves."  TAC ¶ 195.  Allou collected cash on a periodic basis from customers in payment of invoices which averaged $50,000 per month.  TAC ¶ 196-97.  The Jacobs' diversion of these cash collections was accomplished by the issuance of checks by Allou to certain "Brooklyn affiliates in the exact amount of the monthly Cash Collections."  TAC ¶ 199.  The checks were not deposited but were "indorsed by the Brooklyn affiliate-payee back to Allou."  TAC ¶ 200.  At the Jacobs' direction, Allou deposited the checks and recorded the transactions as payments by check on invoices for which Allou had been paid in cash.  TAC ¶ 201.  The Third Amended Complaint states:

> The foregoing circular arrangement was intended to create the appearance on Allou's books and records that Allou had received and had deposited a check in payment for merchandise when, in actuality, Allou had already been paid in cash for such merchandise and the Cash Collections had already been diverted from Allou to the Jacobs for their own exclusive use and benefit and to the exclusion of Allou and its interests.

TAC ¶ 202.

The Plaintiffs allege that "[a]s a result of the foregoing, during the period 1997 through 2003, the Jacobs stole in excess of $6 million in Cash Collections from Allou."  TAC ¶ 203.

Diversion of Funds Through Fictitious Lease Transactions  The Plaintiffs allege that Allou, through the Jacobs, diverted Allou's funds for their own purposes through fictitious lease transactions.  The Third Amended Complaint states:

> Between March 1997 and April 2002, Allou, through the Jacobs, entered into several purported transactions with Applied Financial, Inc. . . . RL.com, and Matrix Funding pursuant to which the alleged purchase of Keystone Pallet Racks by Allou from various vendors was funded by those entities which then allegedly leased the Keystone Pallet Racks to Allou.

TAC ¶ 211.  The vendors who sold the Keystone pallet racks to Allou received "more than $3.1

million" and were affiliated with the Jacobs.  TAC ¶¶ 212, 213.

The Plaintiffs also allege:

> Despite the representations by Allou that it had received the Keystone Pallet
> Racks and despite the payments by . . . Applied Financial, Inc., RL.com and
> Matrix [Funding] to the vendors who allegedly supplied the Keystone Pallet
> Racks and despite Allou's payment on its leases for the Keystone Pallet Racks to .
> . . Applied Financial, Inc., RL.com and Matrix [Funding], Allou never received
> any Keystone Pallet Racks and was never in possession of any Keystone Pallet
> Racks at any of its locations.

TAC ¶ 220.

The Plaintiffs allege that as a result of these transactions, "Allou's credit and funds were

utilized by the Jacobs and diverted to their confederates without any concomitant benefit to

Allou."  TAC ¶ 221.

The Plaintiffs allege that on April 1, 2001, Allou entered into a contract with All

Computer which required All Computer to provide computer hardware, licensing, software, and

consulting services.  TAC ¶ 222.  The Third Amended Complaint states that the president of All

Computer, Joseph Domb, is Victor Jacobs' son-in-law.  TAC ¶ 223.  On June 7, 2002, Allou

entered into a master lease agreement with North Fork Bank which resulted in the leaseback of

the $4.5 million of computer hardware, licensing, software, and consulting services referred to in

the contract between Allou and All Computer.  TAC ¶ 224.  On July 15, 2002, the president of

AHI directed North Fork Bank in writing to wire transfer $4.5 million to All Computer stating

that the computer system was "'satisfactorily installed.'"  TAC ¶ 227.  But the "computer system

was never installed into operation . . . and the computer system needed months of additional

programming and testing."  TAC ¶ 229.  Between April 2001 and February 2003, Allou made

payments "in the total sum of $3,480,000" to All Computer.  TAC ¶ 230.

<u>Diversion of Funds Through Circular Transactions Among Affiliated Entities</u>  The

Plaintiffs allege that the Jacobs diverted at least $56 million of Allou's cash and other assets to

third parties, including their friends, relatives, acquaintances, and related or affiliated business

entities and organizations.  TAC ¶¶ 238, 244.  These transactions include the "transfer of money

to a furrier, a meat distributor, a fish merchant, schools, various religious organizations,

'charities' purposely created by the Jacobs, and other businesses that were not . . . involved in

Allou's . . . business."  TAC ¶ 239.  Many of the individuals and entities that received Allou's

funds "participated in the manipulation of funds they received from Allou and followed the

Jacobs' instructions concerning the disposition of those funds either further transferring the

money . . . or by returning some or all of the money . . . to Allou in furtherance of the scheme to

inflate [Allou's] accounts receivable and inventory."  TAC ¶ 240.

## Discussion

### The Standard for Dismissal Under Rule 12(b)(6)

Rule 12(b)(6) requires the court "to assess the legal feasibility of the complaint, not to

assay the weight of the evidence which might be offered in support thereof."  *Ryder Energy*

*Distrib. Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984).  The court

accepts as true the plaintiff's well-pleaded factual allegations, and "must draw all reasonable

inferences in favor of the plaintiff."  *Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir. 1996).  *See Levy*

*v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001), *cert. denied*, 535 U.S. 1054

(2002); *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995).

The Second Circuit has observed that in addition to the factual allegations contained in

the complaint, the court may also consider the contents of any "documents attached to the

complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may

be taken, or to documents either in the plaintiffs' possession or of which plaintiffs had

knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d

Cir. 1993).

This standard requires a plaintiff to do more than speculate about circumstances that

might conceivably give rise to a claim for relief.  As the Supreme Court recently explained:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need
> detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his
> "entitle[ment] to relief" requires more than labels and conclusions, and a
> formulaic recitation of the elements of a cause of action will not do.  Factual
> allegations must be enough to raise a right to relief above the speculative level, on
> the assumption that all the allegations in the complaint are true (even if doubtful
> in fact).

*Bell Atl. Corp. v. Twombly*, ___ U.S. ___, 127 S. Ct. 1955, 1964-65 (2007) (citations and

quotations omitted).  That is, a plaintiff must allege "enough facts to state a claim to relief that is

plausible on its face" to state a claim that survives scrutiny under Rule 12(b)(6).  *Bell Atlantic*,

127 S. Ct. at 1974.  *See Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (the *Bell Atlantic*

standard "obliges a pleader to amplify a claim with some factual allegations in those contexts

where such amplification is needed to render the claim plausible").  Thus, a claim may be

sustained only if the plaintiff has "nudged [its] claims across the line from conceivable to

plausible." *Bell Atlantic*, 127 S. Ct. at 1974.  *See also Goldstein v. Pataki*, 516 F.3d 50, 56 (2d

Cir. 2008).

The Standard for Dismissal Under Rule 8(a)

Rule 8(a) requires that a complaint set forth "a short and plain statement of the claim

showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  *See Erickson v. Pardus*,

14

__ U.S. __, 127 S. Ct. 2197, 2200 (2007).  "Specific facts are not necessary; the statement need

only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it

rests.'"  *Erickson*, 127 S. Ct. at 2200 (quoting *Bell Atlantic*, 127 S. Ct. at 1959).  As one court

observed:

> The purpose of the statement is to provide "fair notice" of the claim and "the
> grounds upon which it rests."  *Enron Corp. v. J.P. Morgan Sec., Inc. (In re Enron
> Corp.)*, 325 B.R. 671 (Bankr. S.D.N.Y. 2005) (citing *Conley v. Gibson*, 355 U.S.
> 41, 47, 78 S. Ct. 99, 2 L. Ed.2d 80 (1957)).  In other words, "[Rule 8] is designed
> to permit the defendant to have a fair understanding of what the plaintiff is
> complaining about and to know whether there is a legal basis for recovery."
> *Ricciuti v. New York City Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991).

*Official Comm. of Unsecured Creditors of 360Networks (USA), Inc. v. Pirelli Commc'ns Cables

& Sys. USA LLC (In re 360Networks (USA) Inc.)*, 367 B.R. 428, 432 (Bankr. S.D.N.Y. 2007).

Rule 8(a) sets a lower bar than Rule 12(b)(6) or Rule 9(b), and "does not require a

plaintiff to plead the legal theory, facts, or elements underlying his claim."  *Koch v. Hicks (In re

Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.)*, 457 F. Supp. 2d 298, 303-04

(S.D.N.Y. 2006) (quotations and citations omitted).

<u>The Standard for Dismissal Under Rule 9(b)</u>

Rule 9(b) raises the bar for certain types of claims at the pleading stage.  It requires that

"[i]n alleging fraud or mistake, a party must state with particularity the circumstances

constituting fraud or mistake.  Malice, intent, knowledge, and other condition of a person's mind

may be alleged generally."  FED. R. CIV. P. 9(b).  Rule 9(b) serves several purposes, including

"(1) to provide a defendant with fair notice of the claims against him; (2) to protect a defendant

from harm to his reputation or goodwill by unfounded allegations of fraud; and (3) to reduce the

number of strike suits."  *Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 285-

86 (S.D.N.Y. 1998).  *See O'Brien v. Price Waterhouse*, 740 F. Supp. 276, 279 (S.D.N.Y. 1990), *aff'd*, 936 F.2d 674 (2d Cir. 1991).

To satisfy Rule 9(b)'s pleading requirements, "'a complaint must allege with some specificity the acts constituting fraud . . . conclusory allegations that defendant's conduct was fraudulent or deceptive are not enough.'"  *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs. Ltd.)*, 337 B.R. 791, 801 (Bankr. S.D.N.Y. 2005) (quoting *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings, Ltd.*, 85 F. Supp. 2d 282, 293 (S.D.N.Y. 2000)).  The rule requires that allegations of fraudulent misrepresentations must "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  *Shields v. Citytrust Bankcorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).

While Rule 9(b) provides that "intent . . . may be alleged generally," a plaintiff must "allege facts that give rise to a strong inference of fraudulent intent."  *Shields*, 25 F.3d at 1128. The Second Circuit has found that a strong inference of fraudulent intent "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Shields*, 25 F.3d at 1128.

The Elements of a Professional Malpractice Claim

To state a professional malpractice claim under New York law, a plaintiff must allege that "there was a departure from the accepted standards of practice and that the departure was a proximate cause of the injury."  *Kristina Denise Enters., Inc. v. Arnold*, 41 A.D.3d 788, 788, 838

16

N.Y.S.2d 667, 668 (2d Dep't 2007). As the Second Circuit has found, "[u]nder New York law,

'professional malpractice[] is a species of negligence. As such, its general elements are (1)

negligence, (2) which is the proximate cause of (3) damages.'" *Hydro Investors, Inc. v.*

*Trafalgar Power Inc.*, 227 F.3d 8, 15 (2d Cir. 2000) (quoting *Marks Polarized Corp. v. Solinger*

*& Gordon*, 124 Misc. 2d 266, 476 N.Y.S.2d 743, 744 (Sup. Ct. Queens County 1984)). *See*

*Bankruptcy Servs., Inc. v. Ernst & Young (In re CBI Holding Co.)*, 247 B.R. 341, 362 (Bankr.

S.D.N.Y. 2000), *aff'd in part, rev'd in part*, 311 B.R. 350 (S.D.N.Y. 2004).

The Elements of a Fraud Claim

To state a fraud claim under New York law, a plaintiff must allege that "'(1) the

defendant made a material false representation, (2) the defendant intended to defraud the plaintiff

thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered

damage as a result of such reliance.'" *Eastman Kodak Co. v. Wachovia Bank Nat'l Ass'n*, 2007

WL 2406919, at *4 (W.D.N.Y. 2007) (quoting *Bridgestone/Firestone, Inc. v. Recovery Credit*

*Servs.*, 98 F.3d 13, 19 (2d Cir. 1996)). "When there are multiple defendants, the complaint must

provide sufficient information alleging each defendant's individual participation in the

fraudulent conduct." *Nisselson v. Ford Motor Co. (In re Monahan Ford Corp. of Flushing)*, 340

B.R. 1, 26 (Bankr. E.D.N.Y. 2006).

In *State Street Trust Co. v. Alwin C. Ernst*, 278 N.Y. 104, 15 N.E.2d 416 (1938), the New

York Court of Appeals distinguished between an accountant's negligence, which may give rise

to a cause of action in favor of the accountant's client, and gross negligence amounting to fraud,

which may give rise to a cause of action in favor of third parties. The court stated:

> A representation certified as true to the knowledge of the accountants when
> knowledge there is none, a reckless misstatement, or an opinion based on grounds

17

> so flimsy as to lead to the conclusion that there was no genuine belief in its truth, are all sufficient upon which to base liability.  A refusal to see the obvious, a failure to investigate the doubtful, if sufficiently gross, may furnish evidence leading to an inference of fraud so as to impose liability for losses suffered by those who rely on the balance sheet.  In other words, heedlessness and reckless disregard of consequence may take the place of deliberate intention.

*State Street Trust Co.*, 278 N.Y. at 112.  *See also Ross v. Patrusky, Mintz & Semel*, 1997 WL 214957 at *15 (S.D.N.Y. 1997) (fraud claim stated by allegations that auditor knowingly or recklessly issued a false and misleading opinion on a company's financial statements by failing to disclose that the audit was not performed in accordance with GAAS); *Fidelity and Deposit Co. of Maryland v. Arthur Andersen & Co.*, 131 A.D.2d 308, 311, 515 N.Y.S.2d 791, 794 (1st Dep't 1991) (fraud claim stated by allegations of conduct grossly departing from generally accepted auditing and accounting standards); *In re CBI Holding Co.*, 247 B.R. at 367 ("Under New York law, the scienter required to support a common law claim of fraud against auditors or accountants may be satisfied by a showing of either gross negligence or recklessness."); *DaPuzzo v. Reznick Fedder & Silverman*, 14 A.D.3d 302, 302, 788 N.Y.S.2d 69, 70 (1st Dep't 2005) ("In a fraud case against an auditor, a showing of gross negligence or recklessness will permit the trier of fact to draw the inference that a fraud was in fact perpetrated.").

Gross negligence has been found where there were "several acts of negligence with foreseeably severe cumulative effect."  *Internationale Nederlanden (U.S.) Capital Corp. v. Bankers Trust Co.*, 261 A.D.2d 117, 122, 689 N.Y.S.2d 455, 460 (1st Dep't 1999) (citing *Food Pageant, Inc. v. Consolidated Edison Co.*, 54 N.Y.2d 167, 173, 445 N.Y.S.2d 60 (1981)).  Recklessness has been found where there was "[a] refusal to see the obvious, a failure to investigate the doubtful, if sufficiently gross."  *State Sheet Trust Co.*, 278 N.Y. at 112.

<u>The Motions to Dismiss</u>

18

<u>The Trustee's Malpractice Claims</u>

  The Trustee asserts claims against each of the Defendants for malpractice during their audit years, and against Andersen and Mayer Rispler for audit years in which they did not issue an audit opinion but participated in the audit work.  TAC, First to Sixth Claims for Relief.

  <u>*The Applicable Pleading Standard*</u>

  As a threshold matter, the Defendants argue that the Trustee's malpractice claims must be measured by Rule 9(b)'s heightened standard because they arise from the Jacobs' fraud, and that the Trustee's malpractice claims do not meet that standard.  *See* KPMG LLP's Memorandum of Law in Support of its Motion to Dismiss the Third Amended Complaint (the "KPMG Mem.") at 9-11; KPMG LLP's Reply Memorandum of Law in Support of its Motion to Dismiss the Third Amended Complaint (the "KPMG Reply Mem.") at 2-3; Memorandum of Law in Support of Defendant Arthur Andersen LLP's Motion to Dismiss the Third Amended Complaint (the "Andersen Mem.") at 25-29; Reply Memorandum of Law in Support of Defendant Arthur Andersen LLP's Motion to Dismiss the Third Amended Complaint (the "Andersen Reply Mem.") at 6-11.

  KPMG and Andersen argue that in *Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004), the Second Circuit held that the heightened pleading requirements of Rule 9(b) applies to claims brought under Section 11 and Section 12(a)(2) of the Securities Act of 1933 when the claim "sounds in fraud."  *Rombach*, 355 F.3d at 167.  *See* KPMG Reply Mem. at 2; Andersen Mem. at 13, n.4.  In *Rombach*, the Second Circuit found that Rule 9(b) applied to claims that sound in fraud notwithstanding that "[f]raud is not an element or a requisite to a claim under section 11 or section 12(a)(2)."  *Rombach*, 355 F.3d at 171.  The court explained that "while a plaintiff need

allege no more than negligence to proceed under section 11 and section 12(a)(2), claims that do rely upon averments of fraud are subject to the test of Rule 9(b)." *Id.*

Mayer Rispler "joins and adopts the arguments made by co-defendants Andersen and KPMG." Memorandum of Law of Defendant Mayer Rispler & Company, P.C. in Support of its Motion to Dismiss the Complaint in this Adversary Proceeding ("Mayer Rispler Mem.") at 3, n.2.

The Trustee argues that Rule 9(b) does not apply to the malpractice claims because he "does *not* allege that defendants directly participated in the Jacobs' fraud but rather that they committed malpractice against the backdrop of the Jacobs' fraud." Trustee's Memorandum in Opposition to the Motions by Defendants to Dismiss the Third Amended Complaint (the "Trustee's Mem.") at 3, n.6. Citing *Breeden v. Kirkpatrick & Lockhart, LLP (In re Bennett Funding Group, Inc.),* 268 B.R. 704, 708 (S.D.N.Y. 2001), *aff'd*, 336 F.3d 94 (2d Cir. 2003), the Trustee argues that courts appropriately distinguish between allegations that give rise to a trustee's standing, on the one hand, and allegations that comprise the claim, on the other. Trustee's Mem. at 4.

In *Breeden*, the district court found:

> The factual determinations necessary to establish standing are minimally – if at all – intertwined with the merits of the trustee's action. . . . [T]o determine standing under the law of the Second Circuit, the court must ascertain: (1) the level of involvement of BFG's stockholders and managers in the . . . Ponzi scheme; and (2) whether these individuals dominated and controlled BFG. . . . Conversely, resolution of the merits of the trustee's claims would involve an analysis of defendants' professional duty to plaintiff, their alleged breach of such duty, and the causal nexus between such alleged breach and the damages claimed by the trustee.

*Breeden*, 268 B.R. at 707-08. The court concluded that the trustee's standing allegations were

distinct from his allegations of malpractice, breach of fiduciary duty, and negligence.  *Id.  See M'Baye v. New Jersey Sports Production, Inc.*, 2007 WL 431881 at *11 (S.D.N.Y. 2007) (finding that "plaintiff's assertion of a fraud claim does not preclude him from alleging other claims without subjecting the latter to a heightened pleading standard.  Nor does *Rombach* stand for that proposition.").

Generally, "[p]rofessional malpractice is governed by Rule 8, and plaintiff need only make a short and plain statement of the claim." *Bondi v. Grant Thornton Int'l (In re Parmalat Sec. Litig.)*, 377 F. Supp. 2d 390, 411 (S.D.N.Y. 2005).  Under Rule 8(a), "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson*, 127 S. Ct. at 2200 (quoting *Bell Atlantic*, 127 S. Ct. at 1964).  Rule 8(a) "does not require a plaintiff to plead the legal theory, facts, or elements underlying his claim." *In re Methyl Tertiary Butyl Ether "MTBE" Prods. Liab. Litig.*, 457 F. Supp. 2d at 303-04 (quotations and citations omitted).

Here, the Trustee and LaSalle look to many of the same allegations to support their respective claims for malpractice and fraud.  And as noted above, the Trustee's standing to bring the malpractice claims is supported by the Component Frauds.  *See* pp. 10-13, *supra*.  But that does not alter the pleading standard applicable to the Trustee's malpractice claims, or modify the requirements that the Trustee must meet for those claims to survive a motion to dismiss.

Accordingly, the Court finds that Rule 8(a), rather than Rule 9(b), sets forth the appropriate standard to measure the adequacy of the Trustee's malpractice claims.

Whether the Trustee States a Malpractice Claim Against KPMG for the 2002 Audit

The Trustee's First Claim for Relief is for malpractice against KPMG for the 2002 Audit.

KPMG argues that the Trustee does not adequately allege the elements of causation and damages. KPMG Mem. at 11-12; KPMG Reply Mem. at 5-9. KPMG argues that the Trustee does not adequately allege damages because deepening insolvency is not a valid theory of damages for a tort claim, and because the Trustee does not allege harm to Allou that is distinct from the harm claimed by LaSalle. *Id.* KPMG also argues that the Trustee does not adequately allege that KPMG's conduct was a proximate cause of harm from the Component Frauds. *Id*

As discussed above, a claim for professional malpractice sounds in negligence, and its elements are a departure from accepted standards of practice, damages, and proximate causation. *See* pp. 16-17, *supra.* The Court will consider each of these elements in turn.

### Whether the Trustee Adequately Alleges that KPMG Departed from Accepted Standards of Practice

The accepted standards of practice for auditors are well-recognized:

> Generally Accepted Auditing Standards promulgated by the American Institute of Certified Public Accountants (AICPA), are the accepted standards of practice for auditors. *United States v. Arthur Young & Co.*, 465 U.S. 805, 811, 104 S. Ct. 1495, 79 L. Ed. 2d 826 (1984); . . . An accountant's good faith compliance with GAAS and generally accepted accounting principles ("GAAP") discharges the accountant's professional obligation to act with reasonable care. . . .

*Sharp Int'l Corp. v. KPMG LLP (In re Sharp Int'l Corp.)*, 278 B.R. 28, 33 (Bankr. E.D.N.Y. 2002) (citations omitted), *aff'd*, 302 B.R. 760 (E.D.N.Y. 2003), *aff'd*, 403 F.3d 43 (2d Cir. 2005).

Pursuant to these accepted standards of practice:

> The independent auditor examines the corporation's books and records and determines whether the financial reports of the corporation have been prepared in accordance with GAAP, which consists of the conventions, rules and accepted accounting practices promulgated by the accounting profession's Financial Accounting Standards Board. . . . The auditor then issues an opinion stating whether the financial statements, taken as a whole, fairly represent the financial

position and operation of the corporation for the relevant period. . . .  The most favorable report that an auditor may give is an unqualified opinion, which represents the auditor's finding that the company's financial statements present fairly, in all material respects, the financial position of the company, the results of its operations, and the changes in its financial position for the period under audit, in conformity with GAAP.

*In re Sharp Int'l Corp.*, 278 B.R. at 33-34 (citations omitted).

The Trustee alleges that KPMG did not comply with several of the applicable professional standards.  TAC ¶¶ 251-75.  The Third Amended Complaint states:

KPMG violated at least the following requirements of GAAS:

>    (a)    The second general standard that the auditors should maintain an independence in mental attitude in all matters relating to the engagement;
>
>    (b)    The third general standard that due professional care is to be exercised in the performance of the audit and preparation of the report;
>
>    (c)    The first standard of field work that the audit is to be adequately planned and that assistants should be properly supervised;
>
>    (d)    The second standard of field work that the auditor should obtain a sufficient understanding of internal controls so as to plan the audit and determine the nature, timing and extent of tests to be performed;
>
>    (e)    The third standard of field work that sufficient, competent, evidential matter is to be obtained to afford a reasonable basis for an opinion on the financial statements under audit.

TAC ¶ 286.

The Trustee alleges that KPMG did not obtain sufficient competent evidential matter to support Allou's assertions as to its inventory and accounts receivable.  TAC ¶ 285.  For example, the Trustee alleges that in conducting the 2002 Audit, KPMG failed adequately to verify

accounts receivable in accordance with AU § 330[2] by failing to complete confirmation procedures and by failing to plan a perform a reliable test of reported accounts receivable.  TAC ¶¶ 288-309.

The Trustee also alleges that KPMG failed to comply with AU § 331 by failing properly to conduct a test of Allou's inventory and that had it conducted the test with a "proper level of professional skepticism", it would have detected Allou's inventory fraud.  TAC ¶ 330.  The Trustee alleges that KPMG did not "obtain Allou's entire perpetual inventory record for all of the inventory at all locations" and instead obtained only portions of the perpetual inventory record that were selected by Allou, amounting to approximately $68 million of Allou's $185.5 million total reported inventory.  TAC ¶ 314.  The Third Amended Complaint states that "inventory observations" were conducted at different warehouse locations on different days and that steps were not taken to be sure that Allou could not simply move the same inventory to different locations for the observations.  TAC ¶ 315.

The Third Amended Complaint states that KPMG failed to perform tests required by AU § 334 to identify related party transactions.  TAC § 335.  The Trustee alleges that if KPMG had performed proper related party audit procedures and verified subsequent cash receipt transactions, it would have detected Allou's accounts receivable fraud.  TAC § 336.

Accordingly, the Court finds that the Trustee adequately alleges that KPMG's conduct in performing the 2002 Audit constituted a departure from accepted standards of practice.

<u>*Whether the Trustee Adequately Alleges that Allou Suffered Damages*</u>

---

[2]  "AU" refers to the Auditing Interpretations issued by a Task Force of the Auditing Standards Board of the American Institute of Certified Public Accountants.  *See Jacobs v. Coopers & Lybrand, L.L.P.*, 1999 WL 101772 at *3, n.4 (S.D.N.Y. 1999).

KPMG argues that the Trustee does not adequately allege that Allou suffered damages, for several reasons.  First, KPMG argues that the Trustee's allegations of deepening insolvency do not support the element of damages.  KPMG Reply Mem. at 6-9.  Second, KPMG argues that the Trustee does not allege damages to Allou that are distinct from those claimed by LaSalle. KPMG Mem. at 9; KPMG Reply Mem. at 6-9.  And finally, KPMG argues that the Trustee's recovery is limited by the Component Fraud allegations because they are the basis for his standing under the *Wagoner* rule.  KPMG Mem. at 11-12; KPMG Reply Mem. at 5–6.

The Trustee alleges that Allou suffered damages under a deepening insolvency theory of injury.  TAC ¶¶ 248-49.  As one court has found, "'[d]eepening insolvency' refers to the 'fraudulent prolongation of a corporation's life beyond insolvency,' resulting in damage to the corporation caused by increased debt."  *Kittay v. Atl. Bank of N.Y. (In re Global Serv. Group LLC)*, 316 B.R. 451, 456 (Bankr. S.D.N.Y. 2004) (quoting *Schacht v. Brown*, 711 F.2d 1343, 1350 (7th Cir.), *cert. denied*, 464 U.S. 1002 (1983)).

The Trustee's damages allegations were found to be sufficient to withstand the Defendants' motions to dismiss the Second Amended Complaint.  Relying upon *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.,* 267 F.3d 340 (3d Cir. 2001), Judge Cyganowski found that "deepening insolvency caused allegedly by the inaccurate audits [is] enough to state a separate and cognizable injury to the corporation sufficient to sustain the trustee's standing and further to withstand a motion to dismiss as was made here."  Docket No. 103, Transcript of May 16, 2006, hearing, at 18:12-18.  In *Lafferty*, the Third Circuit found that under Pennsylvania law, deepening insolvency is a separate tort, consisting of injury to a debtor's "corporate property from the fraudulent expansion of corporate debt and prolongation of corporate life."  *Lafferty,*

267 F.3d at 347.

Since Judge Cyganowski's ruling, the Third Circuit has revisited its decision in *Lafferty*. In *Seitz v. Detweiler, Hershey and Assocs., P.C. (In re CitX Corp.)*, 448 F.3d 672 (3d Cir. 2006), the court explained:

> In [*Lafferty*], we concluded that deepening insolvency was a valid Pennsylvania cause of action. *Lafferty*, 267 F.3d at 344. Although we did describe deepening insolvency as a "type of injury," *id*. at 347, and a "theory of injury," *id*. at 349, we never held that it was a valid theory of damages for an independent cause of action. Those statements in *Lafferty* were in the context of a deepening-insolvency cause of action. They should not be interpreted to create a novel theory of damages for an independent cause of action like malpractice.

*In re CitX Corp.*, 448 F.3d at 677.

KPMG argues that in light of *In re CitX,* "it is clear that deepening insolvency is not a valid theory of damages for a tort claim," so that the Trustee fails to "allege any harm separate and distinct from that alleged by LaSalle on behalf of the Lenders." KPMG Reply Mem. at 1.

The Trustee argues that he has "not asserted deepening insolvency as a cause of action, but only as a theory of damages recoverable for malpractice." Trustee's Mem. at 15.[3] He argues that in *In re CitX*, the court granted summary judgment to the defendant on the malpractice claim "because the plaintiff failed to prove that the accountants' malpractice caused the company's insolvency to deepen and . . . there was no harm to the company." *Id*. The Trustee further argues:

> [T]he holding of *CitX* acknowledges the possibility that deepening insolvency may constitute a theory of damages recoverable in a malpractice case where, as here, the deepening insolvency resulted in an increase in the company's liabilities and a decrease in its assets and where the increased liability resulted from reliance upon the audited financial statements by the company's lenders.

---

[3] The Trustee makes the same argument in response to Andersen. *See* pp. 38-39, *infra*.

Trustee's Mem. at 16.

Courts in this Circuit have considered deepening insolvency as a basis for damages that may result from the commission of a separate tort. For example, in *Global Service Group v. Atlantic Bank of New York (In re Global Service Group LLC)*, 316 B.R. 451 (Bankr. S.D.N.Y. 2004), the trustee brought an adversary proceeding against the company's lender, alleging that the lender should be liable for the company's deepening insolvency because it knew or should have known that the company could never repay the loan. *In re Global Serv. Group LLC,* 316 B.R. at 459. The court observed that extending credit to an already insolvent company "may be bad banking, but it isn't a tort," and that lenders are not prohibited from extending credit to insolvent entities because, if they were, "most companies in financial distress would be forced to liquidate." *Id*. The court also noted that the trustee did not allege that the lender had extended the loan to enable the borrower's principals to siphon off the company's funds or commit some other wrong. *Id*.

The court found:

> The distinction between " deepening insolvency" as a tort or damage theory may be one unnecessary to make. Prolonging an insolvent corporation's life, without more, will not result in liability under either approach. Instead, one seeking to recover for "deepening insolvency" must show that the defendant prolonged the company's life in breach of a separate duty, or committed an actionable tort that contributed to the continued operation of a corporation, and its increased debt.

*In re Global Serv. Group LLC*, 316 B.R. at 458.

More recently, in *Nisselson v. Ford Motor Co. (In re Monahan Ford Corp. of Flushing)*, 340 B.R. 1 (Bankr. E.D.N.Y. 2006), the trustee brought an action against a lender claiming that it extended credit to the debtor in order to enable its affiliate to defraud the debtor. *In re Monahan Ford Corp. of Flushing*, 340 B.R. at 39. The court found that deepening insolvency required

27

more than a claim of "prolonging an insolvent corporation's life," and that the plaintiff met this requirement by alleging that the lender made the loan to enable the lender's affiliate to defraud the debtor. *In re Monahan Ford Corp. of Flushing*, 340 B.R. at 40. *See Gouiran Holdings, Inc. v. DeSantis, Prinzi, Springer, Keifer & Shall (In re Gouiran Holdings, Inc.)*, 165 B.R. 104, 107 (E.D.N.Y. 1994) (reinstating a claim for negligent preparation of financial statements which may have resulted in debtor incurring unmanageable debt and filing for bankruptcy); *Devon Mobile Commc'ns Liquidating Trust v. Adelphia Commc'ns Corp.*, 2006 WL 687153, at *17 (Bankr. S.D.N.Y. 2006) (finding that "there must be breach of a duty owed to the company (or similar constituency with legal standing) for a claim for deepening insolvency to lie.").

Several courts have addressed deepening insolvency since the Third Circuit's *In re CitX* decision. In this Circuit, one court explained:

> [A] company's insolvency is not deepened simply by the incurrence of new debt where the company suffers no loss on the loan transaction. The insolvency is deepened when, for example, the proceeds of the loan are squandered or assets otherwise are looted. It is at that point that the gap between liabilities and assets widens and the ability to service outstanding debt is impaired.

*In re Parmalat Sec. Litig.*, 501 F. Supp. 2d 560, 574-75 (S.D.N.Y. 2007). The court observed that the dissipation of loan proceeds may deepen a company's insolvency "as it leaves the [company] not only with a new liability but also fewer assets." *In re Parmalat Sec. Litig.*, 501 F. Supp. 2d at 578, n.112. The court found that it "might be appropriate to identify the injury caused by the looting of loan proceeds as 'deepened insolvency' [b]ut the Court sees little reason to do so" because that court found that "[t]he traditional name – looted assets – is sufficient." *Id.*

And in *Miller v. McCown De Leeuw & Co. (In re The Brown Schools)*, 386 B.R. 37 (Bankr. D. Del. 2008), the Delaware bankruptcy court found that *In re CitX* "does not stand for

the broad proposition that deepening insolvency cannot be a valid theory of damages for *any* independent cause of action . . . ." *In re The Brown Schools*, 386 B.R. at 48.  There, the court found that deepening insolvency was a valid theory of damages arising under the trustee's cause of action for breach of fiduciary duty and self-dealing.  *Id.* (citing *Alberts v. Tuft (In re Greater Southeast Cmty. Hosp. Corp. I)*, 353 B.R. 324, 336-37 (Bankr. D.D.C. 2006).  In addition, the court observed that in *In re CitX*, the court found that "the plaintiff could not prove actual harm and causation, two necessary elements of a malpractice claim."  *In re The Brown Schools*, 368 B.R. at 48.

This Court agrees that allegations that a corporation's life was extended through some actionable conduct, without more, do not establish the damages element of a malpractice claim. *In re Monahan Ford Corp. of Flushing*, 340 B.R. at 39-40.  At the same time, the Court also agrees that allegations that a corporation's assets were dissipated, diverted, or depleted, without a corresponding benefit, are sufficient to allege damages.  *In re Parmalat Sec. Litig.*, 501 F. Supp. 2d at 578, n.112.  And this is so whether the assets were loan proceeds or some other tangible corporate asset.  Deepening insolvency has been used by courts and parties to describe the injury suffered by an enterprise when it is left with "not only . . . a new liability but also fewer assets."  *Id.*  That is, deepening insolvency is more accurately viewed as a description, rather than an independent theory, of damages that are otherwise cognizable under the law.

Here, the Trustee alleges more than prolonging an insolvent corporation's life.  He alleges that the Defendants committed malpractice which enabled the Jacobs to continue their diversion and depletion of Allou's assets, which in turn caused injury to Allou.  The Third Amended Complaint states:

> The sums fraudulently borrowed did not benefit Allou, because they were (a) used by the Jacobs to directly or indirectly steal from Allou or transferred without consideration to the Jacobs or their confederates pursuant to a number of fraudulent schemes . . . , or (b) cycled through a series of sham transactions involving Allou and companies owned by the Jacobs or their confederates in order to project the illusion of Allou's financial prosperity and propagate the Jacobs' fraud while actively concealing Allou's deepening insolvency and the continuing theft of Allou's assets.

TAC ¶ 190.

The Trustee also alleges that as a result of the Defendants' malpractice, the Jacobs were able to divert some $70 million of Allou's assets to their own purposes. TAC ¶¶ 195-244. The Third Amended Complaint states that Allou suffered damages of at least $6 million as a result of diversions of cash (TAC ¶¶ 195-210), at least $7 million as a result of diversion of funds through improper lease transactions (TAC ¶¶ 211-37), and at least $56 million as a result of fraudulent transfers and circular transactions (TAC ¶¶ 238-44). Whether these losses are characterized as deepening insolvency, diversions of assets, fraudulent transfers, "looting of loan proceeds," or some other kind of loss, the allegations show that the Trustee alleges injury to Allou.

KPMG also argues that the Third Amended Complaint does not allege damages to Allou that are distinct from those damages claimed by LaSalle. KPMG Mem. at 12; KPMG Reply Mem. at 6-9. The Trustee argues that the Third Amended Complaint alleges damages suffered directly by Allou, including $70 million in damages that resulted from Jacobs' looting and fraud. Trustee's Mem. at 16.[4] The Trustee concludes that the Third Amended Complaint alleges that Allou suffered separate and distinct injuries that are different from those associated with the claims asserted by the creditors. Trustee's Mem. at 17.

---

[4] The Trustee makes the same argument in response to Andersen and Mayer Rispler. *See* pp. 45, 50, *infra*.

The question at this stage is whether the Trustee has adequately alleged an injury to Allou.  *See Smith v. Arthur Andersen LLP*, 421 F.3d 989, 1005 (9th Cir. 2005) (finding damages were properly alleged where the trustee claimed the debtor was injured, even though claims for similar damages could also be asserted by creditors).

As noted above, the Trustee alleges damages suffered directly by Allou as a result of the Defendants' malpractice and the Jacobs' fraud, including losses resulting from diversions of cash (TAC ¶¶ 195-210), diversion of funds through improper lease transactions (TAC ¶¶ 211-37), and fraudulent transfers and circular transactions (TAC ¶¶ 238-44), totaling some $70 million.  The Third Amended Complaint states:

> The fraud caused Allou to borrow far more than it otherwise would have and rendered Allou unable to pay its creditors.  Moreover, the fraud hid the fact that Allou was insolvent and that its insolvency was becoming more severe as the magnitude of the fraud escalated over time, until it was too late to save the company or minimize its losses by, among other things, preventing the continuing looting and, if necessary, filing for bankruptcy at an earlier point in time.  Ultimately, the fraud caused the demise of Allou which, but for each of the defendants' malpractice, gross negligence, recklessness, fraud and breaches of [contract], could have been avoided or, at the very least, the losses incurred could have been significantly reduced.

TAC ¶ 249.

These allegations show that the Trustee alleges damages to Allou that may be independent of its creditors' claims, and at the pleading stage, this is sufficient.  *See Smith*, 421 F.3d at 1003-06.

KPMG further argues that the Trustee's recovery is limited by the Component Fraud allegations, because they form the basis for the Trustee's standing under the *Wagoner* rule.  KPMG Reply Mem. at 5.  And KPMG argues that the Trustee does not allege how KPMG caused "the supposed harm resulting from each of those [Component Frauds]."  KPMG Reply

Mem. at 5.  *See* KPMG Reply Mem. at 5-6.  The Trustee argues that he is entitled to "any and all damages that are the reasonably foreseeable consequence of defendants' malpractice" and that the Federal Rules of Civil Procedure do not require that damages be limited by factual allegations contained in a complaint.  Trustee's Mem. at 19-20.[5]

While the Trustee's standing to bring the malpractice claims is supported by the Component Frauds, that does not mean that damages resulting from the Component Frauds fix the outer boundary of the Trustee's recovery.  Rather, the Trustee's recovery on these claims will be determined by whether he is able to establish the elements of his professional malpractice claim – that is, a departure from the accepted standards of practice, damages, and proximate causation.  *See* pp. 16-17, *supra*.  The Component Fraud allegations establish neither a maximum nor a minimum recovery on those claims.

Accordingly, the Court finds that the Trustee adequately alleges that Allou suffered damages.

### *Whether the Trustee Adequately Alleges that KPMG's Conduct Proximately Caused Damages*

KPMG argues that the Trustee fails adequately to allege causation.  KPMG Mem. at 11-12; KPMG Reply Mem. at 5-6.  KPMG argues that the Trustee "does not allege KPMG's conduct during its audit was the cause of those . . . losses to Allou . . . ."  KPMG Reply Mem. at 6.

The Trustee argues that the Third Amended Complaint alleges that without KPMG's malpractice, Allou's independent directors, audit committee, innocent managers, and Allou's

---

[5] The Trustee makes the same argument in response to Andersen and Mayer Rispler.  *See* pp. 45, 50, *infra*.

outside corporate counsel would have learned of the Jacobs' fraud and would have stopped it. Trustee's Mem. at 18.  Similarly, the Trustee argues that if Allou's lenders had known about the fraud, they would have stopped lending to Allou and Allou's losses would have been minimized. *Id.*[6]

New York law provides that proximate causation is present where "it was reasonably foreseeable that the damage incurred would follow from the wrongful act." *In re Gouiran Holdings, Inc.*, 165 B.R. at 106.  For example, in *In re Gouiran Holdings, Inc.*, proximate causation was established by allegations showing that it was reasonably foreseeable from the accountant's malpractice that the debtor would incur debt that it would not have incurred otherwise and was thereafter not able to service, and that the principals would embezzle funds that they would not otherwise have had available to them.  *In re Gouiran Holdings, Inc.*, 165 B.R. at 107-08.

And in *Bernstein v. Crazy Eddie, Inc.*, 702 F. Supp. 962 (E.D.N.Y. 1989), *vacated in part on other grounds*, 714 F. Supp. 1285 (E.D.N.Y. 1989), the court found that the weakening of a public company's financial position may be proximately caused by its accountant's negligence. *Bernstein v. Crazy Eddie, Inc.*, 702 F. Supp. at 986.  *See In re Parmalat Sec. Litig.,* 501 F. Supp. 2d at 580 ("It is reasonably foreseeable that misrepresenting a company's financial condition, and thus hiding from its innocent managers that the company is being driven into the ground, will cause the company harm."); *In re CBI Holding Co.*, 247 B.R. at 364 ("Where the wrongful act is a failure to perform a duty and performance of the duty would have prevented the harm, causation is established at least where the harm was reasonably foreseeable in the event of a

---

[6] The Trustee makes the same argument in response to Mayer Rispler.  *See* p. 51, *infra*.

dereliction.").

The Trustee alleges that "[a]s a direct and proximate result of defendants' [malpractice], . . . Allou's independent officers, directors, shareholders, and attorneys were not advised of Allou's questionable and improper activities and conduct."  TAC ¶ 18.  The Trustee also alleges that "[i]f Allou's independent officers, directors, shareholders, and attorneys had been advised of Allou's improper activities and conduct, they could have, and would have, stopped Allou's improper activities and conduct."  TAC ¶ 19.  And the Trustee alleges that "as a direct and proximate result of the defendants' malpractice and professional failures, Allou has sustained damages in the amounts set forth herein."  TAC ¶ 20.

The Third Amended Complaint states:

> If [Defendants] had properly performed their professional services, Allou would have discovered the Jacobs' fraudulent activities and could have prevented or reduced the amounts looted by the Jacobs and the losses sustained as a result thereof.
>
> The fraud caused Allou to borrow far more than it otherwise would have and rendered Allou unable to pay its creditors.  Moreover, the fraud hid the fact that Allou was insolvent and that its insolvency was becoming more severe as the magnitude of the fraud escalated over time, until it was too late to save the company or minimize its losses by, among other things, preventing the continuing looting and, if necessary, filing for bankruptcy at an earlier point in time.  Ultimately, the fraud caused the demise of Allou which, but for each of the defendants' malpractice, gross negligence, recklessness, fraud and breaches of [contract], could have been avoided or, at the very least, the losses incurred could have been significantly reduced.

TAC ¶¶ 248-49.

Accordingly, the Court finds that the Trustee adequately alleges that KPMG's conduct in performing the 2002 Audit was a proximate cause of Allou's damages.

Having alleged adequately each of the elements of a claim for professional malpractice

under New York law, and based on the entire record, the Court concludes that the Third

Amended Complaint states a claim for malpractice against KPMG for the 2002 Audit.

<u>Whether the Trustee States a Malpractice Claim Against Andersen for the 2001 Audit</u>

The Trustee's Fourth Claim for Relief is for malpractice against Andersen for the 2001

Audit. Andersen argues that the Trustee does not adequately allege the element of damages

because he does not allege harm to Allou that is distinct from the harm claimed by LaSalle and

that the Trustee may not seek damages that exceed the damages associated with the Component

Frauds. Andersen Mem. at 30-33; Andersen Reply Mem. at 29-35.

A claim for professional malpractice must meet the pleading standard of Rule 8(a). *See*

pp. 19-22, *supra*. The elements of this claim are a departure from accepted standards of practice,

damages, and proximate causation. *See* pp. 16-17, *supra*. The Court will consider each of these

elements in turn.

> ### *Whether the Trustee Adequately Alleges that Andersen Departed from Accepted Standards of Practice with Respect to the 2001 Audit*

The Trustee alleges that Andersen did not comply with several of the applicable

professional standards in connection with the 2001 Audit. TAC ¶¶ 368-89. The Third Amended

Complaint states:

Arthur Andersen violated at least the following requirements of GAAS:

(a)     The second general standard that the auditors should maintain an
        independence in mental attitude in all matters relating to the
        engagement;

(b)     The third general standard that due professional care is to be
        exercised in the performance of the audit and preparation of the
        report;

(c)     The first standard of field work that the audit is to be adequately

planned and that assistants should be properly supervised;

(d)     The second standard of field work that the auditor should obtain a sufficient understanding of internal controls so as to plan the audit and determine the nature, timing and extent of tests to be performed;

(e)     The third standard of field work that sufficient, competent, evidential matter is to be obtained to afford a reasonable basis for an opinion on the financial statements under audit.

TAC ¶ 365.

The Trustee alleges that Andersen did not obtain sufficient competent evidential matter to support Allou's assertions as to its accounts receivable and inventory.  TAC ¶ 364.  As to accounts receivable, for example, the Trustee alleges that in conducting the 2001 Audit, Andersen failed adequately to verify accounts receivable in accordance with AU § 330 by performing only limited testing of the work performed by Mayer Rispler.  TAC ¶¶ 369-70.  The Trustee also alleges that Andersen "failed to properly test for the existence of Sears and WalMart receivables which were reflected as still being outstanding as of June 12, 2001 in the combined amount of approximately $20.3 million."  TAC ¶ 370.  And the Trustee alleges that Andersen accepted the explanation offered by Allou's management that Sears and WalMart were given extended payment terms because the receivables were related to merchandise to be sold during the 2001 Christmas season, and did not conduct any further investigation.  *Id*.  The Third Amended Complaint states that "substantially all of these purported Sears and WalMart accounts receivable were fraudulent."  *Id*.  The Third Amended Complaint states that Andersen's testing of $41.8 million in unverified receivables by testing proof of delivery documentation for only twenty-two invoices was "grossly inadequate."  TAC ¶ 371.

The Trustee also alleges that Andersen did not perform tests required by AU § 334 to

36

identify related party transactions.  TAC ¶ 382.  The Trustee alleges that if Andersen had performed proper related party audit procedures and verified subsequent cash receipts transactions, it would have detected Allou's accounts receivable fraud.  TAC ¶ 383.

The Trustee further alleges that Andersen did not adequately observe or test Allou's inventory.  TAC ¶ 378.  The Trustee alleges that Andersen did not perform any inventory observations, but relied instead upon observations performed by an accounting firm engaged by Mayer Rispler.  TAC ¶ 376.  The Trustee also alleges that while Andersen "noted" that the inventory cost test work performed by Mayer Rispler had "material differences in the costing for the same products," Andersen failed to obtain any support to explain the differences, and failed to complete the work in accordance with the applicable standards.  TAC ¶ 379.

Accordingly, the Court finds that the Trustee adequately alleges that Andersen's conduct in performing the 2001 Audit constituted a departure from accepted standards of practice.

### *Whether the Trustee Adequately Alleges that Allou Suffered Damages*

Andersen argues that the Trustee does not adequately allege that Allou suffered damages, for several reasons.  First, Andersen argues that based on the Third Circuit's decision in *In re CitX*, deepening insolvency may not serve as the basis for the damages element of a malpractice claim.  Andersen Mem. at 32-33; Andersen Reply Mem. at 33-36.  Second, Andersen argues that the Trustee's recovery is limited by the Component Fraud allegations, because they provide the basis for his standing under the *Wagoner* rule.  Andersen Mem. at 30-32; Andersen Reply Mem. at 29-33.  And finally, Andersen argues that the Trustee does not allege harm to Allou that is distinct from the harm claimed by LaSalle.  Andersen Mem. at 32-33; Andersen Reply Mem. at 33-36.

As discussed above, several courts have concluded that allegations that a corporation's assets were dissipated, diverted, or depleted, without a corresponding benefit, are sufficient to allege damages caused by a separate tort. *See* pp. 25-30, *supra*. In these circumstances, the damages arise from the company's widening "gap between liabilities and assets," and the impairment of the company's "ability to service outstanding debt." *In re Parmalat Sec. Litig.*, 501 F. Supp. 2d at 575. And the damages flow from more than simply "prolonging an insolvent corporation's life." *In re Monahan Ford Corp. of Flushing*, 340 B.R. at 40.

The Trustee alleges that Andersen's malpractice enabled the Jacobs to divert millions of dollars of Allou's assets for their own purposes. TAC ¶ 190. And the Trustee alleges that Allou suffered some $70 million in damages, including diversions of cash (TAC ¶¶ 195-210), diversion of funds through improper lease transactions (TAC ¶¶ 211-37), and fraudulent transfers and circular transactions (TAC ¶¶ 238-44). That is, the Trustee's allegations describe a diminution in the value of Allou as an enterprise, not just the prolonging of Allou's corporate existence.

Andersen also argues that the Trustee's recovery is limited by the Component Fraud allegations, because they are the basis for his standing under the *Wagoner* rule. Andersen Mem. at 30-32; Andersen Reply Mem. at 29-33. As discussed above, the Trustee's recovery on these malpractice claims will be determined by whether he is able to establish the elements of his claims, and the Trustee's Component Fraud allegations do not establish a maximum or a minimum recovery on those claims. *See* p. 32, *supra*.

Andersen further argues that the Trustee does not allege harm to Allou that is distinct from the harm claimed by LaSalle. Andersen Mem. at 32-33; Andersen Reply Mem. at 33-36. As discussed above, the Trustee alleges some $70 million in damages suffered directly by Allou,

38

independent of its creditors' claims.  *See* pp. 30-32, *supra*.  *See also* TAC ¶¶ 195-244.  As also

noted above, at this stage of these proceedings, this is sufficient.  *See* pp. 31-32, *supra*.  *See also*

*Smith*, 421 F.3d at 1003-06.

Accordingly, the Court finds that the Trustee adequately alleges that Allou suffered

damages.

<u>Whether the Trustee Adequately Alleges that Andersen's Conduct Proximately Caused</u>
<u>Damages</u>

As discussed above, under New York law, proximate causation is present where "it was

reasonably foreseeable that the damage incurred would follow from the wrongful act."  *In re*

*Gouiran Holdings, Inc.*, 165 B.R. at 106.  *See* pp. 33-34, *supra*.  *See also Bernstein v. Crazy*

*Eddie, Inc.*, 702 F. Supp. at 986; *In re Parmalat Sec. Litig.*, 501 F. Supp. 2d at 580; *In re CBI*

*Holding Co.*, 247 B.R. at 364.

The Third Amended Complaint states that as a direct and proximate result of Andersen's

malpractice, Allou's independent officers, directors, shareholders, and attorneys were not

advised of, and could not prevent, the Jacobs' fraudulent activities and the resulting losses

sustained by Allou.  TAC ¶¶ 18-20.  The Third Amended Complaint states:

> If [Defendants] had properly performed their professional services, Allou would
> have discovered the Jacobs' fraudulent activities and could have prevented or
> reduced the amounts looted by the Jacobs and the losses sustained as a result
> thereof.
>
> The fraud caused Allou to borrow far more than it otherwise would have and
> rendered Allou unable to pay its creditors.  Moreover, the fraud hid the fact that
> Allou was insolvent and that its insolvency was becoming more severe as the
> magnitude of the fraud escalated over time, until it was too late to save the
> company or minimize its losses by, among other things, preventing the continuing
> looting and, if necessary, filing for bankruptcy at an earlier point in time.
> Ultimately, the fraud caused the demise of Allou which, but for each of the
> defendants' malpractice, gross negligence, recklessness, fraud and breaches of

[contract], could have been avoided or, at the very least, the losses incurred could have been significantly reduced.

TAC ¶¶ 248-49.

Accordingly, the Court finds that the Trustee adequately alleges that Andersen's conduct in performing the 2001 Audit was a proximate cause of Allou's damages.

Having alleged adequately each of the elements of a claim for professional malpractice under New York law, and based on the entire record, the Court concludes that the Third Amended Complaint states a claim for malpractice against Andersen for the 2001 Audit.

Whether the Trustee States a Malpractice Claim Against Andersen for the 2002 Audit

The Trustee's Second Claim for Relief is for malpractice against Andersen in connection with the 2002 Audit.  As a threshold matter, Andersen argues that the Trustee cannot assert this claim because Andersen did not issue the 2002 Audit and was replaced by KPMG before completing its work.  Andersen Mem. at 33-36; Andersen Reply Mem. at 36-40.  Andersen also argues that "if an auditor is retained *for the purpose of conducting a audit* . . . then that auditor cannot be held liable in negligence if it is replaced by another auditor prior to issuing its opinion, and a successor auditor therefore issues the opinion of the company's financial statements." Andersen Reply Mem. at 37.  Andersen further argues that "the hiring of a successor auditor who actually did provide the 2002 audit report constitutes an intervening and superseding cause for any alleged errors in Andersen's interim work."  Andersen Mem. at 35.

In addition, Andersen argues that it is "well-settled that an auditor cannot be held liable for damages for errors in company financial statements unless it actually conducted the audit of those financial statements."  Andersen Mem. at 34.  In support, Andersen cites *In re Warnaco Group, Inc. Sec. Litig. (II)*, 388 F. Supp. 2d 307, 314 (S.D.N.Y. 2005); *Wright v. Ernst & Young*

40

*LLP*, 152 F.3d 169, 175 (2d Cir. 1998); *Binder v. Gillespie*, 184 F.3d 1059, 1067 (9th Cir. 2000); and *Danis v. USN Comm'n, Inc.*, 121 F. Supp. 2d 1183, 1193 (N.D. Ill. 2000). Andersen Mem. at 34-35.

The Trustee argues that the cases cited by Andersen are federal securities class actions brought by shareholders, not common law malpractice claims asserted by the accounting firm's client. Trustee's Mem. at 21 n.41. The Trustee argues that while "the issuance of an audit report may be relevant to claims by reliant third parties such as LaSalle and the Lenders," Allou, as Andersen's client, may state a malpractice claim to recover its damages proximately caused by "defective services" performed by Andersen. Trustee's Mem. at 20-21.[7]

The Trustee also argues that "Arthur Andersen had a duty to inform Allou's audit committee of any and all material discrepancies that they discovered during the course of the accounting service they performed for Allou which was never contingent upon their issuance of an audit opinion." Trustee's Mem. at 21. Citing *1136 Tenants' Corp. v. Max Rothenberg & Co.*, 36 A.D.2d 804, 319 N.Y.S.2d 1007 (1st Dept. 1971), *aff'd*, 30 N.Y.2d 585, 330 N.Y.S.2d 800 (1972), the Trustee notes that a claim may lie where an accountant engaged to perform services other than audit services negligently ignored suspicious circumstances and did not inform its client of missing invoices, permitting an employee's defalcation to go unnoticed. *1136 Tenants' Corp.*, 36 A.D.2d at 805, 319 N.Y.S.2d at 1007-08.

Courts set appropriate limits on the liability that may be imposed on a company's professionals under Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated

---

[7] The Trustee makes the same argument in response to Mayer Rispler. *See* pp. 52-53, *infra*.

thereunder. *See, e.g.*, *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, __U.S.__, 128 S.

Ct. 761, 769 (2008) (there is no private right of action under Section 10(b) against secondary

actors, such as accountants, who knowingly participate in transactions that assist another

company's Section 10(b) violations); *Cent. Bank of Denver, N.A. v. First Interstate Bank of*

*Denver, N.A.*, 511 U.S. 164, 191 (1994) (there is no private right of action against a secondary

actor for aiding and abetting another's use of a material misstatement where the secondary actor

does not commit a deceptive act); *Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d

269, 272-73 (S.D.N.Y. 2008) (allegations of "scheme liability" against a secondary actor do not

satisfy Section 10(b)); *In re Philips Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 472 n.5

(S.D.N.Y. 2004) (an auditor "can be held liable under Section 10(b) [of the Securities Exchange

Act of 1934] only for its own misrepresentations concerning the [company's] financial

statements.").

But the Trustee's claim against Andersen is not for violations of the securities laws, but

for professional malpractice. As the Trustee alleges:

> In connection with the services it performed with respect to the 2002 Audit and
> related accounting services, Arthur Andersen committed malpractice and
> breached its duty to exercise that degree of skill, care, knowledge and judgment
> usually exercised by members of its profession, including a duty to report to
> Allou's Audit Committee, material discrepancies, suspicious circumstances and
> defects in Allou's internal controls that should have raised red flags to a
> reasonably skilled and knowledgeable accountant, or that Arthur Andersen knew
> or should have known of as a result of those services.

TAC ¶ 425.

Viewed another way, the Trustee's malpractice claim does not arise directly from the

issuance of the audit report in connection with the 2002 Audit. Rather, it is based on Andersen's

alleged departures from accepted standards of practice, and the damages caused by those

42

departures.  Essentially, an accountant's obligation to act in accordance with the applicable

professional standards is not limited to those situations where an auditor's opinion is issued.

That is not to say that the Trustee's claim is simple or straightforward.  To succeed on

this claim, the Trustee will be required to prove not only that Andersen's services departed from

the applicable professional standards, but also that these departures proximately caused damages

to Allou.  These elements, and in particular, the element of proximate causation, may be difficult

to establish where another auditor completed the 2002 Audit and issued an opinion on Allou's

financial statements.  But at the pleading stage, the Trustee may state a claim based on

Andersen's duty to perform its services in accordance with the applicable professional standards,

and Andersen may be liable to its client – or here, to the Trustee – if it did not do so.

Accordingly, the Court finds that the Trustee is not precluded from stating a malpractice

claim against Andersen in connection with the 2002 Audit.

> *Whether the Trustee Adequately Alleges that Andersen Departed from Accepted*
> *Standards of Practice with Respect to the 2002 Audit*

The Trustee alleges that Andersen did not comply with several of the applicable

professional standards in connection with the 2002 Audit.  TAC ¶¶ 351-53.  The Third Amended

Complaint states that of the $185.5 million of inventory reported by Allou at March 31, 2002,

"millions of dollars" of this amount were fictitious.  TAC ¶ 311.  The Trustee alleges that

Andersen failed to comply with AU § 331 and "other sections of GAAS for the verification of

inventory balances," and that had these tests been performed, Andersen would have "detected

that millions of dollars of inventory . . . were nonexistent or materially overvalued."  TAC ¶ 313.

The Trustee alleges that Andersen did not "obtain Allou's entire perpetual inventory record for

all of the inventory at all locations" and instead obtained only portions of the perpetual inventory

43

that were selected by Allou, amounting to approximately $68 million of Allou's $185.5 million total reported inventory.  TAC ¶ 314.  And the Third Amended Complaint states that "inventory observations" were conducted at different warehouse locations on different days and that steps were not taken to be sure that Allou could not simply move the same inventory to different locations for the observations.  TAC ¶ 315.

The Third Amended Complaint also states that "even the physical observation procedures performed by Andersen revealed glaring discrepancies in the perpetual inventory records."  TAC ¶ 316.  The Trustee alleges that Andersen did not comply with AU 350.25, which requires complete resolution of missing items.  TAC ¶ 318.  With respect to the inventory observation procedures performed at the Brooklyn warehouse, the Trustee alleges:

> [I]n early January 2002, as part of its inventory observation procedures at the Brooklyn warehouse, Arthur Andersen selected 40 items for verification by test counts and discovered that there were discrepancies between the test counts made by Arthur Andersen and Allou's perpetual inventory records for nine of these items or 22.5% of the sample.  Moreover, Arthur Andersen discovered that these same nine items were not reflected at all on the warehouse's records.  As a result, Arthur Andersen determined that it could not reach a conclusion on the accuracy of the inventory court.  At that time, Arthur Andersen advised Herman [Jacobs] of the discrepancies and asked him for an explanation.  Herman [Jacobs] never responded to that inquiry.

> Arthur Andersen also asked Nachman Lichter ("Lichter"), the operator of the Brooklyn warehouse, for records that would reconcile the discrepancies.  However, Lichter, like Herman Jacobs, never furnished the requested information. . . .

> [I]n May 2002, Arthur Andersen sought the assistance of Mayer Rispler to obtain the requested information and reconcile the discrepancies.  However, upon information and belief, the discrepancies were never reconciled by the time KPMG . . . executed its [2002] Audit Report.

TAC ¶¶ 316-18.

The Trustee also alleges that an inventory observation conducted by Andersen at a

44

Stanford warehouse also revealed "exceptions" and indications of "ineffective internal controls related to inventory." TAC ¶ 321.

Accordingly, the Court finds that the Trustee adequately alleges that Andersen's conduct in connection with the 2002 Audit constituted a departure from accepted standards of practice.

### *Whether the Trustee Adequately Alleges that Allou Suffered Damages*

As with the Trustee's malpractice claim arising out of the 2001 Audit, Andersen argues that the Trustee does not adequately allege that Allou suffered damages, for several reasons, including that deepening insolvency may not serve as the basis for the damages element of a malpractice claim, that the Trustee's recovery is limited by the Component Fraud allegations, and that the Trustee does not allege harm to Allou that is distinct from the harm claimed by LaSalle. Andersen Mem. at 30-33; Andersen Reply Mem. at 29-36.

As discussed above, none of these arguments is sufficient to overcome the adequacy of the Trustee's allegations as to the damages suffered by Allou. *See* pp. 37-39, *supra*.

Accordingly, the Court finds that the Trustee adequately alleges that Allou suffered damages.

### *Whether the Trustee Adequately Alleges that Andersen's Conduct Proximately Caused Damages*

The Trustee alleges that as a direct and proximate result of Andersen's malpractice, Allou's independent officers, directors, shareholders, and attorneys were not advised of, and could not prevent, the Jacobs' fraudulent activities and the resulting losses sustained by Allou. TAC ¶¶ 18-20. The Third Amended Complaint states:

> If [Defendants] had properly performed their professional services, Allou would
> have discovered the Jacobs' fraudulent activities and could have prevented or
> reduced the amounts looted by the Jacobs and the losses sustained as a result

45

thereof.

> The fraud caused Allou to borrow far more than it otherwise would have and rendered Allou unable to pay its creditors.  Moreover, the fraud hid the fact that Allou was insolvent and that its insolvency was becoming more severe as the magnitude of the fraud escalated over time, until it was too late to save the company or minimize its losses by, among other things, preventing the continuing looting and, if necessary, filing for bankruptcy at an earlier point in time.  Ultimately, the fraud caused the demise of Allou which, but for each of the defendants' malpractice, gross negligence, recklessness, fraud and breaches of [contract], could have been avoided or, at the very least, the losses incurred could have been significantly reduced.

TAC ¶¶ 248-49.

As noted above, New York law provides that proximate causation is present where "it was reasonably foreseeable that the damage incurred would follow from the wrongful act." *In re Gouiran Holdings, Inc.*, 165 B.R. at 106.  *See* p. 33-34, *supra*.  *See also Bernstein v. Crazy Eddie, Inc.*, 702 F. Supp. at 986; *In re Parmalat Sec. Litig.*, 501 F. Supp. 2d at 580; *In re CBI Holding Co.*, 247 B.R. at 362.

And finally, as also noted above, the hurdles that the Trustee may face as a matter of proof are significant.  *See* p. 43, *supra*.  But whether the Trustee can prove this element of his claim is a different question than whether he has stated this element of his claim.

Accordingly, the Court finds that the Trustee adequately alleges that Andersen's conduct in connection with the 2002 Audit was a proximate cause of Allou's damages.

Having alleged adequately each of the elements of a claim for professional malpractice under New York law, and based on the entire record, the Court concludes that the Third Amended Complaint states a claim for malpractice against Andersen in connection with the 2002 Audit.

<u>Whether the Trustee States a Malpractice Claim Against Mayer Rispler for the 2000 Audit</u>

The Trustee's Sixth Claim for Relief is for malpractice against Mayer Rispler for the 2000 Audit. Mayer Rispler argues that the Trustee's malpractice claim relating to the 2000 Audit "must be dismissed because the Trustee fails to allege what Mayer Rispler actually did wrong or how any mistakes Mayer Rispler might have made were the proximate cause of any damages suffered by Allou." Mayer Rispler Reply Mem. at 1-2. *See* Mayer Rispler Mem. at 2. Mayer Rispler also argues that the Trustee lacks standing because he is pursuing a claim which belongs to creditors. Mayer Rispler Mem. at 2; Mayer Rispler Reply Mem. at 5-6.

A claim for professional malpractice must meet the pleading standard of Rule 8(a). *See* pp. 19-22, *supra*. The elements of this claim are a departure from accepted standards of practice, damages, and proximate causation. *See* pp. 16-17, *supra*. The Court will consider each of these elements in turn.

### *Whether the Trustee Adequately Alleges that Mayer Rispler Departed from Accepted Standards of Practice with Respect to the 2000 Audit*

As noted above, Mayer Rispler argues that the Trustee does not allege "what Mayer Rispler actually did wrong." Mayer Rispler Reply Mem. at 1.

The Trustee alleges that Mayer Rispler did not comply with several of the applicable professional standards in connection with the 2000 Audit. TAC ¶¶ 394-420. The Third Amended Complaint states:

Mayer Rispler violated at least the following requirements of GAAS:

(a)    The second general standard that the auditors should maintain an independence in mental attitude in all matters relating to the engagement;

(b)    The third general standard that due professional care is to be exercised in the performance of the audit and preparation of the report;

47

      (c)      The first standard of field work that the audit is to be adequately planned and that assistants should be properly supervised;

      (d)      The second standard of field work that the auditor should obtain a sufficient understanding of internal controls so as to plan the audit and determine the nature, timing and extent of tests to be performed;

      (e)      The third standard of field work that sufficient, competent, evidential matter is to be obtained to afford a reasonable basis for an opinion on the financial statements under audit.

TAC ¶ 400.

The Third Amended Complaint states that out of the $75.8 million of Allou's accounts receivable reported at March 31, 2000, approximately $25 million were fictitious. TAC ¶ 403. The Trustee alleges that Mayer Rispler failed adequately to verify accounts receivable in accordance with AU § 330 by mishandling or not completing confirmation procedures. TAC ¶¶ 402, 404.

The Trustee alleges that $24.5 million of the March 31, 2000, reported accounts receivable had not been collected, including $9.4 million from Sears and $13.7 million from Walmart, "all of which were fictitious." TAC ¶ 405. The Trustee also alleges that Mayer Rispler did not undertake any additional procedures to investigate the past due receivables from Sears and WalMart, as well as from Walgreen's, CVS, and McKesson Corporation, and accepted management's explanation for the $24.5 million in uncollected accounts receivable without any evidential support. TAC ¶ 406.

The Third Amended Complaint also states that Mayer Rispler did not observe the May 11, 2000, physical inventory of the Brooklyn warehouse as required under AU §§ 312 and 331 but, instead, elected to perform test counts on May 17, 2000. TAC ¶ 407. And the Trustee

alleges that these test counts were flawed in that Mayer Rispler's procedure "paid no attention to product numbers or product descriptions." *Id*. The Trustee alleges that if Mayer Rispler "had performed the tests required by AU § 331 . . . and other sections of GAAS for the verification of inventory balances, it would have detected substantial amounts of fraud." TAC ¶ 409.

The Third Amended Complaint further states that Mayer Rispler failed to perform tests required by AU § 334 to identify related party transactions, to evaluate their economic substance, or to provide appropriate disclosures in Allou's financial statement. TAC ¶ 410. And the Third Amended Complaint states that Mayer Rispler did not appropriately consider related party transactions, including in circumstances where Mayer Rispler provided professional services to the related party as well as to Allou. TAC ¶ 411.

Accordingly, the Court finds that the Trustee adequately alleges that Mayer Rispler's conduct in performing the 2000 Audit constituted a departure from accepted standards of practice.

### *Whether the Trustee Adequately Alleges that Allou Suffered Damages*

Mayer Rispler argues that the Trustee lacks standing to bring this claim because it belongs to Allou's creditors, not to the estate. Mayer Rispler Reply Mem. at 5-6. Mayer Rispler also suggests that the damages that the Trustee seeks are no different than those sought by creditors. Mayer Rispler Reply Mem. at 5-6.

At the outset, the Trustee has standing to assert this malpractice claim because the claim belongs to Allou. And "the ultimate question in determining whether a trustee has standing is whether the debtor corporation has been injured." *Smith*, 421 F.3d at 1005.

The Trustee alleges that Mayer Rispler's malpractice enabled the Jacobs to divert

49

millions of dollars of Allou's assets for their own purposes.  TAC ¶ 190.  The Trustee also

alleges that Allou suffered some $70 million in damages, including diversions of cash (TAC

¶¶ 195-210), diversion of funds through improper lease transactions (TAC ¶¶ 211-37), and

fraudulent transfers and circular transactions (TAC ¶¶ 238-44).  The Trustee alleges some $70

million in damages suffered directly by Allou, independent of its creditors' claims.  TAC ¶¶ 195-

244.

Accordingly, the Court finds that the Trustee adequately alleges that Allou suffered

damages.

### *Whether the Trustee Adequately Alleges the Mayer Rispler's Conduct Proximately Caused Damages*

Mayer Rispler argues that the Trustee does not allege "how any mistakes Mayer Rispler

might have made were the proximate cause of any damages suffered by Allou."  Mayer Rispler

Reply Mem. at 1-2.

As discussed above, New York law requires a plaintiff to allege facts sufficient to show

that "it was reasonably foreseeable that the damage incurred would follow from the wrongful

act."  *In re Gouiran Holdings, Inc.*, 165 B.R. at 106.  *See* pp. 33-34, *supra.  See also Bernstein v.*

*Crazy Eddie, Inc.*, 702 F. Supp. at 986; *In re Parmalat Sec. Litig.*, 501 F. Supp. 2d at 580; *In re*

*CBI Holding Co.*, 247 B.R. at 362.

As also discussed above, the Trustee alleges that as a direct and proximate result of

Mayer Rispler's malpractice, Allou's independent officers, directors, shareholders, and attorneys

were not advised of, and could not prevent, the Jacobs' fraudulent activities and the resulting

losses sustained by Allou.  TAC ¶¶ 18-20.

The Third Amended Complaint alleges:

> If [Defendants] had properly performed their professional services, Allou would have discovered the Jacobs' fraudulent activities and could have prevented or reduced the amounts looted by the Jacobs and the losses sustained as a result thereof.
>
> The fraud caused Allou to borrow far more than it otherwise would have and rendered Allou unable to pay its creditors. Moreover, the fraud hid the fact that Allou was insolvent and that its insolvency was becoming more severe as the magnitude of the fraud escalated over time, until it was too late to save the company or minimize its losses by, among other things, preventing the continuing looting and, if necessary, filing for bankruptcy at an earlier point in time. Ultimately, the fraud caused the demise of Allou which, but for each of the defendants' malpractice, gross negligence, recklessness, fraud and breaches of [contract], could have been avoided or, at the very least, the losses incurred could have been significantly reduced.

TAC ¶¶ 248-49.

Accordingly, the Court finds that the Trustee adequately alleges that Mayer Rispler's conduct in performing the 2000 Audit was a proximate cause of Allou's damages.

Having alleged adequately each of the elements of a claim for professional malpractice under New York law, and based on the entire record, the Court concludes that the Third Amended Complaint states a claim for malpractice against Mayer Rispler for the 2000 Audit.

<u>Whether the Trustee States a Malpractice Claim Against Mayer Rispler for the 2002 and 2001 Audits</u>

The Trustee's Third and Fifth Claims for Relief are for malpractice against Mayer Rispler in connection with the 2002 Audit and the 2001 Audit, respectively. Mayer Rispler argues that the Trustee cannot assert these claims because Mayer Rispler did not issue the audits at issue. Mayer Rispler Mem. at 16-18; Mayer Rispler Reply Mem. at 2-3. It argues that "if the audits were deficient. . . and caused harm to Allou, that harm . . . was caused by auditor who conducted the audit and issued an audit report, not by Mayer Rispler." Mayer Rispler Reply Mem. at 2.

The Trustee alleges:

> Even though Mayer Rispler did not issued the 2002 Audit Report [and the 2001
> Audit Report], it still had a duty to perform its services competently and to
> disclose to the Audit Committee the material discrepancies it discovered in
> rendering professional services to its client, Allou, in connection with the auditing
> procedures it performed during the 2002 Audit [and the 2001 Audit].  Mayer
> Rispler failed to do so.

TAC ¶¶ 356, 393.

As discussed above, the Trustee's malpractice claims do not arise solely or directly from the issuance of the audit reports at issue.  Rather, these claims are based Mayer Rispler's alleged departures from applicable standards of practice, and the damages caused by those departures.  And Mayer Rispler's obligation to comply with applicable professional standards in carrying out its work is not abated because another firm issued an auditor's opinion in the year at issue.  *See* pp. 40-43, *supra*.

At the same time, as also discussed above, to succeed on this claim, the Trustee will be required to prove each of the elements of this claim – that is, that Mayer Rispler departed from the applicable professional standards and that these departures proximately caused damages to Allou.  These elements, including proximate causation, may be difficult to establish, but that does not mean that the Trustee may not attempt to state a claim.  *See* p. 43, *supra*.

Accordingly, the Court finds that the Trustee is not precluded from stating a malpractice claim against Mayer Rispler in connection with the 2002 Audit and the 2001 Audit.

> *Whether the Trustee Adequately Alleges that Mayer Rispler Departed from Accepted
> Standards of Practice With Respect to the 2002 Audit and the 2001 Audit*

The 2002 Audit  As to the 2002 Audit, the Third Amended Complaint similarly states that Mayer Rispler was "continuously involved in assisting Arthur Andersen and KPMG as Allou's former outside auditor and current internal auditor."  TAC ¶ 280.  The Trustee alleges

that the testing for accounts receivable was initially performed by Mayer Rispler, which devised a confirmation test for accounts receivable for 103 customers (the "103 Customer Test") including Allou's two largest customers, Sears and WalMart.  TAC ¶ 291.  This test required "full and complete verification of the entire $67.3 [million] included in the sample of 103 customers or consideration of the unverified amount as an accounting error."  TAC ¶ 292.  The Trustee alleges that "if the 103 Customer Test had been completed and performed properly, the fraud would have been discovered."  TAC ¶ 291.  And the Trustee alleges that Mayer Rispler "knew, or should have known, that discrepancies in Allou's perpetual inventory records indicated that there were serious problems with Allou's inventory records which required additional procedure to be performed" but that such procedures were either never performed or performed with "gross negligence and recklessness."  TAC ¶¶ 310, 311.

Finally, the Trustee alleges:

[A]s a result of Mayer Rispler's direct involvement in the 2001 Audit conducted by Arthur Andersen, as well as the 2000 Audit conducted by Mayer Rispler, it knew or should have known when it performed its professional services in connection with the 2002 Audit and the 2001 Audit that the financial statements and internal controls of Allou were inherently suspect.

TAC ¶ 354.

Accordingly, the Court finds that the Trustee adequately alleges that Mayer Rispler's conduct in connection with the 2002 Audit constituted a departure from accepted standards of practice.

The 2001 Audit  As to the 2001 Audit, the Third Amended Complaint states that Mayer Rispler was "continuously involved in assisting Arthur Andersen as Allou's former outside auditor and current internal auditor."  TAC ¶ 359.  The Trustee alleges that Mayer Rispler did

not complete testing procedures required by AU §§ 330 and 350.  TAC ¶ 361.  And the Trustee

alleges that in testing the existence of the reported accounts receivables, Mayer Rispler used a

procedure that called for the testing of $80.2 million of accounts receivable, but verified only

$27.6 million of the receivables, leaving some $52.6 million in receivables without verification.

TAC ¶ 369.

The Trustee also alleges that Mayer Rispler did not perform the tests required by AU

§ 331 by failing to "properly plan and observe inventory counts and/or test inventory values and

control procedures."  TAC ¶ 375.  The Third Amended Complaint also states that Mayer Rispler

did not appropriately scrutinize purchasing transactions with related parties or conduct

appropriate additional procedures to explain discrepancies in the cost of goods purchased.  TAC

¶ 380.

Accordingly, the Court finds that the Trustee adequately alleges that Mayer Rispler's

conduct in connection with the 2001 Audit constituted a departure from accepted standards of

practice.

### Whether the Trustee Adequately Alleges that Allou Suffered Damages

As noted above, Mayer Rispler argues that the Trustee lacks standing because the claims

that he seeks to pursue belong to Allou's creditors, and the damages that he seeks are no

different than those sought by creditors.  Mayer Rispler Reply Mem. at 5-6.

As discussed above, the Trustee alleges that Mayer Rispler's malpractice enabled the

Jacobs to divert millions of dollars of Allou's assets for their own purposes.  TAC ¶ 190.  The

Trustee also alleges that Allou suffered some $70 million in damages, including diversions of

cash (TAC ¶¶ 195-210), diversion of funds through improper lease transactions (TAC ¶¶ 211-

37), and fraudulent transfers and circular transactions (TAC ¶¶ 238-44). The Trustee alleges some $70 million in damages suffered directly by Allou, independent of its creditors' claims. TAC ¶¶ 195-244. *See* p. 50, *supra*.

Accordingly, the Court finds that the Trustee adequately alleges that Allou suffered damages.

> ### *Whether the Trustee Adequately Alleges that Mayer Rispler's Conduct Was a Proximate Cause of Allou's Damages with Respect to the 2002 Audit and the 2001 Audit*

Mayer Rispler argues that if the 2002 Audit or the 2001 Audit was deficient and caused harm to Allou, the harm was "caused by the auditor who conducted the audit and issued an audit report, not by Mayer Rispler." Mayer Rispler Reply Mem. at 2.

As discussed above, New York law requires a plaintiff to allege facts sufficient to show that "it was reasonably foreseeable that the damage incurred would follow from the wrongful act." *In re Gouiran Holdings, Inc.*, 165 B.R. at 106. *See* pp. 33-34, *supra*. *See also Bernstein v. Crazy Eddie, Inc.*, 702 F. Supp. at 986; *In re Parmalat Sec. Litig.*, 501 F. Supp. 2d at 580; *In re CBI Holding Co.*, 247 B.R. at 362.

As also discussed above, the Trustee alleges that as a direct and proximate result of Mayer Rispler's malpractice, Allou's independent officers, directors, shareholders, and attorneys were not advised of, and could not prevent, the Jacobs' fraudulent activities and the resulting losses sustained by Allou. *See* pp. 34-35, *supra*. *See also* TAC ¶¶ 18-20.

The Third Amended Complaint alleges:

> If [Defendants] had properly performed their professional services, Allou would have discovered the Jacobs' fraudulent activities and could have prevented or reduced the amounts looted by the Jacobs and the losses sustained as a result thereof.

> The fraud caused Allou to borrow far more than it otherwise would have and rendered Allou unable to pay its creditors. Moreover, the fraud hid the fact that Allou was insolvent and that its insolvency was becoming more severe as the magnitude of the fraud escalated over time, until it was too late to save the company or minimize its losses by, among other things, preventing the continuing looting and, if necessary, filing for bankruptcy at an earlier point in time. Ultimately, the fraud caused the demise of Allou which, but for each of the defendants' malpractice, gross negligence, recklessness, fraud and breaches of [contract], could have been avoided or, at the very least, the losses incurred could have been significantly reduced.

TAC ¶¶ 248-49. While proving this claim may be difficult, the question of the adequacy of proof is not before the Court. *See* p. 43, *supra*.

Accordingly, the Court finds that the Trustee adequately alleges that Mayer Rispler's conduct in connection with the 2002 Audit and the 2001 Audit was a proximate cause of Allou's damages.

Having alleged adequately each of the elements of a claim for professional malpractice under New York law, and based on the entire record, the Court concludes that the Third Amended Complaint states a claim for malpractice against Mayer Rispler in connection with the 2002 Audit and the 2001 Audit.

LaSalle's Claims Against the Defendants for Fraud

LaSalle asserts claims against each of the Defendants for fraud in connection with their audit work and issuance of an audit report. TAC, Seventh to Ninth Claims for Relief.

As discussed above, LaSalle's fraud claims must be measured by the heightened pleading standard of Rule 9(b), which requires that "[i]n alleging fraud or mistake, a party must state with particularity, the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). *See* pp. 15-16, *supra*. To satisfy this standard, "'conclusory allegations that defendant's conduct was fraudulent or deceptive are not enough.'" *In re Actrade Fin. Techs. Ltd.*, 337 B.R. at 801

(quoting *Odyssey Re (London) Ltd.*, 85 F. Supp. 2d at 293).  Rather, allegations of fraudulent

misrepresentations must "'(1) specify the statements that the plaintiff contends were fraudulent,

(2) identify the speaker, (3) state where and when the statements were made, and (4) explain why

the statements were fraudulent.'"  *Shields*, 25 F.3d at 1127-28 (quoting *Mills*, 12 F.3d at 1175).

As also discussed above, the element of intent to defraud may be satisfied by allegations

of gross negligence or recklessness.  That is:

> A representation certified as true to the knowledge of the accountants when
> knowledge there is none, a reckless misstatement, or an opinion based on grounds
> so flimsy as to lead to the conclusion that there was no genuine belief in its truth,
> are all sufficient upon which to base liability.  A refusal to see the obvious, a
> failure to investigate the doubtful, if sufficiently gross, may furnish evidence
> leading to an inference of fraud so as to impose liability for losses suffered by
> those who rely on the balance sheet.  In other words, heedlessness and reckless
> disregard of consequence may take the place of deliberate intention.

*State Street Trust Co.*, 278 N.Y. at 112.  *See* p. 17-19, *supra*.

Whether LaSalle States a Fraud Claim Against KPMG

LaSalle's Seventh Claim for Relief is for fraud against KPMG in connection with the

2002 Audit based upon gross negligence and recklessness.  KPMG argues that LaSalle does not

adequately allege the elements of reliance and intent.  KPMG Mem. at 9-11, 13-14.  KPMG also

argues that LaSalle does not adequately allege that it intended to induce the Lenders to act in

reliance on the 2002 Audit.  KPMG Mem. at 13.

As discussed above, the elements of a fraud claim are that the defendant made a material

false representation, the defendant intended to defraud the plaintiff thereby, the plaintiff

reasonably relied on the representation, and the plaintiff suffered damages as a result of its

reliance.  *See* pp. 17-19, *supra*.  The Court will consider each of these elements in turn.

*Whether LaSalle Adequately Alleges that KPMG Made Material False Representations*

Rule 9(b) requires that allegations of material false representations specify the statement claimed to be fraudulent, identify the maker of the statement, state when and where the statement was made, and explain why the statement was fraudulent. *Shields*, 25 F.3d at 1127-28.

The Third Amended Complaint states:

> On or about July 3, 2002, KPMG issued its unqualified 2002 Audit Report on the 2002 Financial Statements, stating, *inter alia*, that it had audited the Financial Statements in accordance with GAAS and that, in its opinion, the Financial Statements presented fairly, in all material respects, the financial position and results of operations and cash flows of Allou for the fiscal year ended March 31, 2002, in conformity with GAAP.

TAC ¶ 277.

LaSalle alleges that Allou's 2002 Financial Statements, which were the subject of KPMG's 2002 Audit Report, were materially false and misleading because, among other things:

(a)     they grossly overstated Allou's revenues and reported grossly inflated assets, net worth, earning and cash flows;

(b)     they grossly overstated Allou's inventory and accounts receivable thereby grossly overstating its assets, net worth, earnings and cash flows;

(c)     they were not prepared in accordance with GAAP;

(d)     they failed to adequately disclose the magnitude and economic substance of numerous related party transactions with the Jacobs in accordance with GAAP;

(e)     they failed to identify and report illegal acts, including fraud, in accordance with GAAS; and

(f)     KPMG did not conduct the 2002 Audit in accordance with AU § 150 *Generally Accepted Auditing Standards*, and other sections of GAAS, and either knew of, or recklessly disregarded, the failure to utilize sufficient audit procedures to satisfy GAAS and/or either knew of, or recklessly disregarded, the fraud at Allou.  Addititonally, KPMG failed to properly qualify its Audit Report in accordance with AU § 500, *The Fourth Standard of Reporting*.

TAC ¶ 283.

LaSalle also alleges that KPMG stated in the 2002 Audit Report:

(a)     that [it] had conducted [its] audit in accordance with [GAAS],

(b)     that [it] had planned and performed the audit to obtain reasonable assurance about whether the financial statements were free of material misstatement, and

(c)     that in [KPMG's] opinion the consolidated financial statements presented fairly, in all material respects, the financial position of Allou and the results of its operations and its cash flows for the year then ended, in conformity with [GAAP].

TAC ¶ 4.

LaSalle alleges that these statements were materially false because KPMG did not conduct the 2002 Audit in accordance with GAAS in that it failed:

(a)     to adequately plan its audit or to assess the risk of material misstatement,

(b)     to adequately investigate or understand (i) Allou's industry, (ii) Allou's business or operations, or (iii) Allou's financial relationships with its customers or suppliers,

(c)     to ascertain through its direct personal knowledge, obtain through physical examination, observation, computation and inspection, information relating to Allou's 2002 Financial Statements but rather relied upon information and representations provided to it by the Jacobs and Mayer Rispler as a substitute for the application of GAAS, or

(d)     to exercise appropriate professional skepticism and to obtain sufficient competent evidential matter.

TAC ¶ 348.

LaSalle further alleges that KPMG made material false statements when it stated that the

2002 Financial Statements "presented fairly, in all material respects, the financial position [of

Allou] and [the] results of [its] operations and [its] cash flows," because "[o]ut of $109.7 million

59

of reported accounts receivable . . . at March 31, 2002, at least $60 million, or 55%, were fictitious," and "millions of dollars" of the $185.5 million of reported inventory at March 31, 2002, was "fictitious."  TAC ¶¶ 277, 289, 311.

Accordingly, the Court finds that LaSalle adequately alleges that KPMG made material false representations.

<u>*Whether LaSalle Adequately Alleges that KPMG Acted with Fraudulent Intent*</u>

KPMG argues that LaSalle does not adequately allege that it acted with fraudulent intent. KPMG Mem. at 9-11.  It argues that "Plaintiffs merely repeat their prior assertions that *if* KPMG had conducted its audit differently, it *would have discovered* the sophisticated fraud perpetrated by Allou."  KPMG Mem. at 10.  KPMG also notes that "these hindsight allegations . . . are not sufficient."  KPMG Mem. at 11.  KPMG argues that LaSalle does not adequately allege that it acted with fraudulent intent because the Third Amended Complaint "[does] not otherwise set forth facts sufficient to infer that KPMG was so reckless it must have been aware of the fraud." *Id.*

LaSalle argues that the Third Amended Complaint states specific facts that constitute strong circumstantial evidence of recklessness, and that this satisfies the requirement to plead fraudulent intent.  LaSalle Mem. at 31.[8]  LaSalle points to various allegations in the Third Amended Complaint that support the conclusion that KPMG and the other defendants departed from accepted standards of practice and ignored red flags while conducting the 2002 Audit. LaSalle Mem. at 36-42.

---

[8]  LaSalle makes the same argument in response to Andersen and Mayer Rispler.  *See* pp. 81, 92, *infra*.

Under New York law, "the scienter required to support a common law claim of fraud against auditors or accountants may be satisfied by a showing of either gross negligence or recklessness." *In re CBI Holding Co.*, 247 B.R. at 367.

Courts recognize that "at the pleading stage . . . allegations of GAAS violations, coupled with allegations that significant 'red flags' were ignored, can suffice to withstand a motion to dismiss." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 279 (3d Cir. 2006) (citing cases). *See In re Light Mgmt. Group, Inc. Sec. Litig.*, 2003 WL 22990062, at *1 (S.D.N.Y. 2003) (intent may be established by facts constituting strong circumstantial evidence of recklessness, and recklessness may be inferred where auditor ignores numerous red flags that should have caused it to investigate further); *In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F. Supp. 2d 290, 295 (S.D.N.Y. 1999) ("Although allegations of GAAP and GAAS violations alone are insufficient to create a strong inference of reckless behavior . . . additional facts showing that there were numerous red flags that [defendant] must have been aware of, if it were conducting any kind of audit" adequately allege fraudulent intent); *In re Smartalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 505, 516 (S.D. Ohio 2000) ("GAAP and GAAS violations are relevant to show an auditor's scienter when the complaint also identifies specific, highly suspicious facts and circumstances available to the auditor at the time of the audit and alleges that these facts were ignored, either deliberately or recklessly.").

That is, in order to allege the intent element of its fraud claim, LaSalle must allege not only that KPMG departed from accepted standards of practice, but also that these departures caused KPMG to overlook red flags or other suspicious facts and circumstances through conduct that was willful, reckless, or grossly negligent. And these allegations must be made with the

particularity required by Rule 9(b).

As discussed above, the Third Amended Complaint states a malpractice claim against KPMG for the 2002 Audit, and as an element of that claim, that KPMG departed from accepted standards of practice. *See* pp. 22-25, *supra*. A review of the Third Amended Complaint shows that it also describes specific departures from accepted standards of practice in areas including accounts receivable, inventory, and related party transactions. The Third Amended Complaint also states that "KPMG had actual knowledge of the discrepancies discovered by Arthur Andersen and the deficiencies in the tests performed by Arthur Andersen" because "[t]hree of the four principal members of the Arthur Andersen audit team, including the audit partner who had been in charge of the 2001 Audit, also performed the 2002 Audit, initially as employees of Arthur Andersen and then as employees of KPMG." TAC ¶ 281.

<u>Alleged Departures from Standards of Practice with Respect to Accounts Receivable</u>

The Third Amended Complaint states that "[o]ut of the $109.7 million of reported accounts receivable of Allou at March 31, 2002, at least $60 million, or 55%, were fictitious." TAC ¶ 289. LaSalle alleges that accounts receivable procedures performed in connection with the 2002 Audit Complaint were "deficient on their face because those procedures did not identify a fraud of this magnitude, and the failure to detect these irregularities demonstrates an extreme departure from the standards of ordinary care common to auditors." *Id*.

LaSalle alleges that "AU 330, *The Confirmation Process*, and other sections of GAAS require that accounts receivable be verified" when the level of risk assessment is high such as in the case of Allou, because of, among other reasons, "Allou's significant related party relationships, extended credit terms, a weak economy for many of Allou's customers . . . ." TAC

62

¶ 288.  The Third Amended Complaint states that confirmation procedures were commenced but not completed and that if these procedures been properly planned and performed, "they would have detected the bogus invoices to such customers as Sears and WalMart."  TAC ¶ 288.

LaSalle alleges that KPMG did not confirm several large payments.  For example, the Third Amended Complaint states that checks show that $1 million of the $2.9 million in subsequent collections from Tereza Merchandising Inc. did not come from that firm, but from a third party alleged to be a "sham entity owned or controlled by the Jacobs."  TAC ¶ 292.  Similarly, checks show that more than $1 million in collections from Ipex Trading did not come from that firm, but from other Allou entities.  TAC ¶ 293.

The Third Amended Complaint states that the confirmation procedures used by Mayer Rispler were categorized into two groups, one for accounts under $10 million and another for accounts over $10 million.  TAC ¶ 294.  LaSalle alleges that as to the accounts under $10 million, as of "May 28, 2002, the test sample of accounts under $10 million had a total unpaid balance of $1.3 million . . . that was not verified in accordance with GAAS."  TAC ¶ 294.  LaSalle also alleges that the $1.3 million open balance "consisted [primarily] of outstanding receivables from a purported customer . . . in the amount of $807,205," and that the "entire amount was fraudulent."  TAC ¶ 295.  LaSalle alleges that KPMG "examined the Mayer Rispler work papers containing the result of the 103 Customer Test" and that "KPMG knew, or should have known, that Mayer Rispler never completed that test and that approximately nine percent (9%) of the first group . . . remained unverified and required further investigation."  TAC ¶ 296.  LaSalle also alleges that "no such further investigation of the unresolved balance was conducted by KPMG."  *Id.*

LaSalle alleges that as to the accounts over $10 million, as of March 31, 2002, Sears owed $17,461,631 and WalMart owed $16,634,794.  TAC ¶ 297.  LaSalle also alleges that "[i]n an attempt to authenticate the accounts receivable balance, Mayer Rispler compared Allou's March 31, 2002 aging report with its May 31, 2002 aging report which indicated that the entire Sears balance had been paid, but that most of the WalMart balance . . . was still outstanding." *Id*.

> The Third Amended Complaint states:
>
> None of the defendants did anything to investigate the unpaid WalMart balance, other than to discuss with [the president and principal accounting officer of Allou Healthcare, Inc.], who claimed the reason why the WalMart balance was past due by more than 60 days was that special terms were given to these two customers because of Mother's Day and Father's Day promotions, and because WalMart and Sears allegedly "asked that special courtesy be given them in light of the post-9/11 economical situation, which affected retailers severely."  This explanation makes no sense since it fails to explain why Sears was apparently able to timely satisfy its outstanding balance while WalMart was not.

TAC ¶ 297.

LaSalle alleges "KPMG did nothing further, in reckless disregard of its obligations as auditor.  As was subsequently discovered, substantially all of the Sears payments originated from third-parties and were fraudulent.  Similarly, all of the outstanding WalMart invoices were fraudulent."  *Id*.  LaSalle alleges that KPMG did not complete the 103 Customer Test for the second group of accounts receivable, and if it had done so, it would have uncovered the fraud with respect to the Sears and WalMart accounts.  TAC ¶ 298.

LaSalle also alleges that KPMG designed a test "that, if executed, would have uncovered the fraud . . . ."  TAC ¶ 299.  This test called for the random selection of 165 representative invoices and a review of cash receipts for each invoice, or bills of lading if cash receipts were

not available (the "165 Cash Receipts Test").  *Id*.  The Third Amended Complaint states that

"[s]ince more than 50% of the invoices were fraudulent, *i.e.*, 28,000 out of 55,000, KPMG would

certainly have discovered the fraud in approximately 82 of the 165 invoices."  *Id*.

The Third Amended Complaint states that KPMG did not perform the 165 Cash Receipts

Test and instead, tested only fifteen customers (the "15 Customer Test"), which encompassed

689 invoices.  TAC ¶ 300-01.  LaSalle alleges that the 15 Customer Test was flawed in that it did

not call for testing any of the $34 million in receivables due from Sears and WalMart, Allou's

two largest customers (TAC ¶¶ 300-01); it did not provide for KPMG to review any supporting

cash receipts (TAC ¶ 300); and only 79 of the 689 invoices tests were invoices of ADI, even

though ADI represented $86 million of Allou's $109.7 million in accounts receivable as of

March 31, 2002 (TAC ¶ 302).  The Third Amended Complaint states that for these reasons, the

15 Customer Test was "inherently unreliable as a test of the total reported accounts receivable."

*Id*.

The Third Amended Complaint also states that in testing the 689 invoices, KPMG elected

to trace collection amounts to entries in Allou's cash postings journal rather than to perform a

more reliable test including the examination of copies of electronic payments or checks issued by

third parties.  TAC ¶ 303.  LaSalle alleges that GAAS requires alternative procedures to be

performed that do not rely exclusively on internal records, but that KPMG looked to Allou's

cash postings journal based on its reliance on a "Revenue/Cash Receipts Cycle" test.  TAC ¶

304.  The Third Amended Complaint states that the purpose of this test was to obtain sufficient

evidence that sales revenue and costs of goods sold are accurate and properly recorded.  *Id*.

LaSalle alleges that the Revenue Cash/Receipts Cycle test was flawed in that KPMG elected to

check only thirty test items representing actual customers' payments.  TAC ¶ 305.

> The Third Amended Complaint states:
>
> The test required that the transactions be supported by copies of the customer's
> check or electronic payment receipt.  According to KPMG, all of the 30 test items
> were traced to their respective customer payments and KPMG actually observed a
> copy of the customer's check or electronic payment receipt.  In fact, 6 of the 30
> invoices or 20% of the tested sample were fictitious invoices, with payments from
> third party entities such as "Capital Sales Corp.," "SE-Roebuck, Ltd." and "Omni
> Development and Marketing Ltd.," all of which were sham entities controlled by
> the Jacobs.  Indeed, some of these checks were signed by Ari Jacobs, the son of
> Victor and brother of Herman and Jacob, and by Jacob Schwartz, a longtime
> employee of Allou who was Victor's nephew and Herman and Jacob's cousin.
> Thus, KPMG either never performed the test it said it had performed, or
> performed the test and disregarded this clear evidence of fraud that was staring in
> its face.  Either way, KPMG knew or should have known of the fraud or, at the
> very least, that Allou's cash postings journal could not be relied upon for
> purposes of verifying accounts receivable and cash receipts.

TAC ¶ 305.

The Third Amended Complaint states that in connection with its 15 Customer Test, when

the cash postings journal indicated an unpaid invoice, KPMG was required to review bills of

lading to verify the existence and amount of the outstanding accounts receivable.  TAC ¶ 307.

The Third Amended Complaint states:

> KPMG's work papers demonstrate that, in connection with at least one of the 15
> customers, *i.e.*, Ipex, the cash postings journal showed that, out of a total invoice
> amount of $1,498,659, invoices of $168,772 were not reflected as having been
> paid in the cash postings journal.  Thus, under KPMG's own test procedures,
> KPMG was required to review bills of lading for these invoices.  However,
> KPMG either did not perform any further testing of these outstanding Ipex
> invoices, or KPMG performed the requisite test and discovered that no bills of
> lading for these invoices existed, but decided to simply ignore this material
> discrepancy that indicated the possibility of fraud.  In fact, all of the Ipex invoices
> were fraudulent and unsupported by any bills of lading.

TAC ¶ 307.

<u>Alleged Departures from Standards of Practice with Respect to Inventory</u>  The Third

Amended Complaint states that Allou's 2002 Financial Statements reported inventory to be $185.5 million as of March 31, 2002, when millions of dollars of the reported inventory were fictitious. TAC ¶ 311. LaSalle alleges that if KPMG had performed the tests required by GAAS for the verification of inventory balances, it would have detected that the millions of dollars of inventory reported on Allou's trial balances either were materially overvalued or did not exist. TAC ¶ 313.

LaSalle also alleges that KPMG did not properly plan the procedures to examine the observation and testing of Allou's inventory. TAC ¶ 314. The Third Amended Complaint states that rather than obtaining Allou's entire perpetual inventory record for all of the inventory at all locations, KPMG obtained portions of the perpetual inventory record, selected by Allou, corresponding to approximately $68 million of the total reported inventory of $185.5 million. *Id*. LaSalle alleges that allowing the client to select the portions of the perpetual inventory to test amounts to an impermissible client imposed limitation that "should have prevented KPMG from issuing an unqualified Audit Report." *Id*.

The Third Amended Complaint states that none of the physical inventory observations was performed on the actual date that the inventory count was taken by Allou, and that the inventory observations at the Brooklyn and Brentwood warehouse locations took place on different days. TAC ¶ 315. LaSalle alleges that this gave Allou the opportunity to move inventory between warehouses, a technique that may be used to perpetuate an inventory fraud. *Id*.

LaSalle alleges that KPMG did not employ heightened procedures for the Brooklyn warehouse that should have been used because that warehouse was owned by Mom & Sons

67

Realty, LLC, a company owned or controlled by the Jacobs. TAC ¶ 319-20. LaSalle notes that the Defendants, including KPMG, knew or should have known this because Mayer Rispler was also the accountant for Mom & Sons Realty, LLC. TAC ¶320.

LaSalle alleges that KPMG "recklessly ignored" "exceptions" and indications of "ineffective internal controls" and discrepancies found by Andersen in certain of its inventory observations which were relied on by KPMG. TAC ¶ 321. LaSalle alleges that these were red flags signaling that "Allou's internal controls of inventory were suspect." TAC ¶ 321.

The Third Amended Complaint states that because certain of the inventories were conducted on dates other than Allou's year-end, KPMG should have performed a rollforward or rollback of the inventory balances as of the date of the physical inventory to the balance sheet date. TAC ¶ 324. LaSalle alleges:

> [T]he Brooklyn inventory was conducted and observed by Arthur Andersen on January 9, 2002. As part of the audit, the auditor should have taken the inventory balance on that date and added all the purchases and deducted all the cost of sales between January 9th and March 31, 2002, *i.e.*, rollforward the inventory balance as of the date of the physical. The result of these rollforward or rollback procedures . . . should, when properly tested, provide evidential matter supporting the March 31, 2002 inventory balance.

TAC ¶ 324.

LaSalle alleges that "KPMG did not obtain competent evidential matter to support the rollforward and rollback of the inventory, and the related balances for all locations, for the period between the physical inventory observation dates and the balance sheet date of March 31, 2002." TAC ¶ 325. It alleges that this was because KPMG ignored or failed to investigate material discrepancies between the balances indicated in Allou's general ledger and the balances indicated in the inventory observation work papers. *Id*. LaSalle also alleges that "the procedures

performed by KPMG to test [the rollforwards and rollbacks] were fundamentally flawed" because KPMG did not include the Brooklyn warehouse in the warehouses selected to test.  TAC ¶ 327.

The Third Amended Complaint also states that the costing tests performed by KPMG, which are procedures to gather vendor invoice data as evidence in support of a client's reported unit costs, were flawed, and that "KPMG was not in a position to issue an unqualified opinion on the March 31, 2002 consolidated financial statements in accordance with AU § 312, AU § 326, AU § 350 and other sections of GAAS."  TAC ¶¶ 328-29.  LaSalle alleges that one of the costing tests prepared and performed by KPMG showed that supporting documentation could not be located for 17 of the 59 products selected for testing, and that rather than performing additional procedures to resolve the discrepancies, KPMG excluded the 17 products from the test.  TAC ¶ 328.  LaSalle alleges that "[i]f all of these 17 products had been properly tested, the fraud would have been discovered."  *Id.*

The Third Amended Complaint states that "KPMG ignored the deterioration of year-over-year performance of Allou and the industry statistics it had obtained . . ."  TAC ¶ 332.  LaSalle alleges:

> [T]hese industry statistics indicated an average inventory turnover of 7.47 time per year, while Allou was not even managing to achieve two time per year.  This is another red flag that required KPMG to perform heightened testing procedures that KPMG chose to ignore.

TAC ¶ 332.

<u>Alleged Departures from Standards of Practice with Respect to Related Party Transactions</u>  The Third Amended Complaint states that KPMG "failed to discover that Allou had dealings with numerous entities owned and/or controlled by the Jacobs . . . and that these

69

entities were involved in various aspects of the fraud, including the bogus invoices and third

party payments." TAC ¶ 334.  The Third Amended Complaint states that "once a related party is

identified, the auditor is guided by AU § 334.09 to 334.10 to examine identified relationships

with related parties." TAC ¶ 335.  LaSalle allege that "KPMG failed to perform these

procedures and never even obtained an understanding of the nature and magnitude of the

relationship between Allou and the related parties that KPMG did identify (*i.e.* Ever Ready and

A&M)." *Id*.  The Third Amended Complaint states:

> Ever Ready and A&M were vendors to Allou, and the 2002 Financial Statements
> disclose approximately $21 million of related party purchases during the year
> ended March 31, 2002.  KPMG also failed to consider A-1 Medical even though
> it was identified as a related party in prior audits.  During 2002, Ever Ready,
> A&M and A-1 Medical "advanced" $46 million to Allou which was not disclosed
> in the consolidated financial statements and was used to mask fraudulent accounts
> receivable.  Had KPMG properly performed required related party procedures and
> verified subsequent cash receipts transactions, it would have detected Allou's
> accounts receivable fraud.

TAC ¶ 336.

Finally, LaSalle alleges that KPMG ignored substantial discrepancies between the

balances noted in the inventory observation work papers and the balances presented in Allou's

general ledger.  TAC ¶ 325.  LaSalle alleges:

> KPMG also ignored the deterioration of year-over-year of Allou and the industry
> statistics it had obtained when comparing these statistics to Allou's inventory
> performance.  For example, these industry statistics indicated an average
> inventory turnover of 7.47 times per year, while Allou was not even managing to
> achieve two times per year.  This is yet another red flag that required KPMG to
> perform heightened testing procedures that KPMG chose to ignore.

TAC ¶ 332.

Taken as a whole, LaSalle alleges departures from accepted standards of practice through

conduct that was reckless or grossly negligent in areas including accounts receivable, inventory,

and related party transactions.  LaSalle also alleges that these departures caused KPMG to overlook several red flags and suspicious facts.  *See* TAC ¶¶ 296-97, 306-08, 320-21, 325, 332, 335.  These include allegations, among others, that KPMG knew or should have known that Mayer Rispler did not complete the 103 Customer Test, and that a significant fraction of ADI's receivables were unverified and required further investigation.  TAC ¶ 296.  These also include the failure to investigate the large amount in receivables due from WalMart and Sears, the explanation given by the Jacobs that the balances were past due because special terms had been given because of Mother's Day and Father's Day promotions, and the fact that the WalMart invoices were fraudulent and the payments on the Sears Account originated from third parties.  TAC ¶ 297.  These also include that KPMG ignored the fact that no bills of lading existed for some $168,722 in outstanding Ipex invoices, which indicated the possibility of fraud.  TAC ¶ 307.  And these include that KPMG did not uncover the fact that much of Allou's business was conducted with several entities related to the Jacobs.  TAC ¶¶ 334-36.

Accordingly, the Court finds that LaSalle adequately alleges that KPMG acted with fraudulent intent.

### *Whether LaSalle Adequately Alleges that It Reasonably Relied on KPMG's Representations*

KPMG argues that LaSalle's allegations of reliance are too conclusory to satisfy the heightened pleading standard of Rule 9(b).  KPMG Reply Mem. at 12.  KPMG also argues that LaSalle "fails to allege KPMG's representations were made 'with the intent to be communicated to persons who relied on it to their detriment.'"  KPMG Mem. at 13 (citations omitted).  And KPMG argues that the Lenders could not have relied upon the 2002 Audit because the 2002 Audit was not issued until ten months after the Lenders entered into the Loan Agreement.

71

KPMG Mem. at 14.

LaSalle argues that it alleges with the necessary particularity that it relied upon the 2002 Audit Report. LaSalle Mem. at 5-6. LaSalle also argues that it is not required to allege that KPMG made the representations with the specific intent that those representations be communicated to the Lenders and that the Lenders rely on them. LaSalle Mem. at 52-60.[9] LaSalle notes that under New York law:

> there are at least three types of claims against an accountant: first, a negligence claim by a person in actual privity with the accountant (typically the accountant's client); second, a negligence claim by a third party not in privity with the accountant, but where there is sufficient "linking conduct" between the third party and the accountant "approaching privity"; third, a fraud claim, including fraud based upon allegations of gross negligence, by a third party that is neither in privity nor "approaching privity" with the accountant. 2-15 WARREN'S NEGLIGENCE IN THE NEW YORK COURTS, § 15.04.

LaSalle Mem. at 52. LaSalle argues that its claim is within the third category, that is, fraud based upon gross negligence claimed by a third party not in privity with KPMG. *Id.*

New York law requires a plaintiff alleging fraud to plead actual, direct reliance upon the representation made by the defendant. *Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. at 288. And "'the asserted reliance must be found to be justifiable under all the circumstances before a complaint can be found to state a cause of action in fraud.'" *Granite Partners, L.P.*, 17 F. Supp. 2d at 288 (quoting *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 322, 157 N.E.2d 597, 599-600, 184 N.Y.S.2d 599, 603 (1959)). *See Knight Sec. v. Fidelity Trust Co.*, 5 A.D.3d 172, 173, 774 N.Y.S.2d 488, 489 (1st Dep't 2004) ("'[A] plaintiff . . . need only plead that he relied on misrepresentations made by the defendant . . . since reasonableness of his reliance [generally]

---

[9] LaSalle makes the same argument in response to Andersen and Mayer Rispler. *See* pp. 85, 93, *infra.*

implicates factual issues whose resolution would be inappropriate at this time'") (alteration in original) (quoting *Internet Law Library, Inc. v. Southridge Capital Mgt. LLC*, 223 F. Supp. 2d 474, 485 (S.D.N.Y. 2002)).; *Foothill Capital Corp. v. Grant Thornton LLP*, 276 A.D.2d 437, 438, 715 N.Y.S.2d 389 (1st Dep't 2000) (plaintiff "sufficiently pleaded its reliance on the 1997 report in alleging that, in reliance on that report, it refrained from taking steps to collect funds already advanced or to protect its interests by other means.") (internal quotation marks omitted) (citation omitted). *Cf. Bangkok Crafts Corp. v. Capitolo Di San Pietro in Vaticano*, 2006 WL 1997628, at *8 (S.D.N.Y. 2006) ("'[T]he reasonableness of [a plaintiff's] reliance implicates factual issues whose resolution would be inappropriate at this early stage.'") (quoting *Internet Law Library,* 223 F. Supp. 2d at 485).

The grounds for which accountants may be held liable in negligence for injury to non-contractual parties were set forth in *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 483 N.E.2d 110, 493 N.Y.S.2d 435 (1985). The New York State Court of Appeals held:

> Before accountants may be held liable in negligence to noncontractual parties who rely to their detriment on inaccurate financial reports, certain prerequisites must be satisfied: (1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance.

*Credit Alliance Corp.*, 65 N.Y.2d at 551, 483 N.E.2d at 118, 493 N.Y.S.2d at 443. That is, an accountant may be liable for its negligence to a noncontractual party only where these prerequisites are met.

But these prerequisites do not apply to the reliance element of a claim for fraud. As the court found in *Houbigant, Inc. v. Deloitte & Touche, LLP*, 303 A.D.2d 92, 753 N.Y.S.2d 493 (1st

73

Dep't 2003), a plaintiff is not required to allege that the defendant intended to induce the plaintiff

to act in reliance on its representation:

> As to the motion court's reasoning that the fraud claim must fail because it cannot
> be inferred that Deloitte made the misrepresentations with the specific intent to
> induce Houbigant's acts, the law does not require such specific intent for a fraud
> claim. Rather, the plaintiff must only allege facts from which it may be inferred
> that the defendant was aware that its misrepresentations would be reasonably
> relied upon by the plaintiff, not that the defendant intended to induce the
> particular acts of detrimental reliance ultimately undertaken by the plaintiff.

*Houbigant, Inc.*, 303 A.D.2d at 100, 753 N.Y.S.2d at 499-500 (citations omitted). *Cf. Credit*

*Alliance Corp.*, 65 N.Y.2d at 540, 483 N.E.2d at 115, 493 N.Y.S.2d at 441(observing in dicta that

"accountants might be held liable in fraud to nonprivy parties who were intended to rely upon the

accountants' misrepresentations.").

LaSalle alleges that "the Lenders . . . made loans and other advances and provided other

financial accommodations to [Allou] in an amount up to $200,000,000 on a revolving basis."

TAC ¶ 137. LaSalle also alleges that "[e]ach Lender received the 2002 Financial Statements and

the 2002 Audit Report of KPMG, and, in determining to continue to extend financial

accommodations to Allou, each Lender reasonably relied upon the 2002 Financial Statements and

the 2002 Audit Report of KPMG." TAC ¶ 151.

The Third Amended Complaint states:

> KPMG knew that the 2002 Audit Report and the financial information contained
> in the 2002 Audit Report were intended to be used by Allou to obtain and
> continue to obtain financing and knew that the Lenders were receiving and
> relying upon the 2002 Audit Report and the financial information contained in
> that 2002 Audit Report, which were fraudulently misstated. Allou's Form 10-K
> filed with the SEC for the fiscal year ended March 31, 2002, which contained the
> 2002 Audit Report, expressly referenced the Loan Agreement, which required
> Allou to furnish audited financial statements and Forms 10-K and 10-Q to the
> Lenders. KPMG was familiar with the terms of the Loan Agreement, including
> the financial reporting provisions that required this financial information to be

furnished to the Lenders.

TAC ¶ 152.

And the Third Amended Complaint states that KPMG conducted reviews of Allou's Forms

10-Q filed with the SEC for the quarters ended June 30, 2001, September 30, 2001, December 31,

2001, June 30, 2002, September 30, 2002, and December 31, 2002.  TAC ¶ 153(c).  LaSalle

alleges that "[a]ll of the defendants knew that the Forms 10-Q were intended to be used by Allou

to obtain and continue to obtain financial accommodations."  TAC ¶ 155.  LaSalle alleges that

each Lender reasonably relied upon the 2002 Financial Statements and KPMG's 2002 Audit

Report "in determining to continue to extend financial accommodations to Allou."  TAC ¶ 151.

Accordingly, the Court finds that LaSalle adequately alleges that it reasonably relied upon

KPMG's representations.

### *Whether LaSalle Adequately Alleges that KPMG's Representations Proximately Caused Damages*

Under New York law, a common law fraud claim requires a plaintiff to plead that the

defendant's false representations "were the proximate cause of the [plaintiff's] injury; in other

words, that the [plaintiff's] injury was a foreseeable consequence of the defendant['s]

misrepresentations . . . ."  *In re Monahan Ford Corp. of Flushing*, 340 B.R. at 32-33 (citing

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172-73 (2d Cir. 2005).  *See Emergent Capital. Inv.*

*Mgmt., LLC v. Stonepath Group, Inc*., 343 F.3d 189, 197 (2d Cir. 2003); *Catton v. Defense Tech.*

*Sys., Inc.,* 2006 WL 27470, at *6 (S.D.N.Y. 2006)).

LaSalle alleges:

KPMG knew that the 2002 Audit Report and the financial information contained
in the 2002 Audit Report were intended to be used by Allou to obtain and
continue to obtain financing and knew that the Lenders were receiving and

75

relying upon the 2002 Audit Report and the financial information contained in that 2002 Audit Report, which were fraudulently misstated.

TAC ¶ 152.  LaSalle also alleges that "KPMG was familiar with the terms of the Loan Agreement, including the financial reporting provisions that required this financial information to be furnished to the Lenders."  *Id*.  And the Third Amended Complaint states:

> But for KPMG's gross negligence, recklessness and fraud in connection with the 2002 Audit and related accounting services, the Lenders' losses would have been avoided or, at the very least, significantly reduced.
>
> As a direct and proximate result of KPMG's fraud, including fraud predicated upon its gross negligence and recklessness, LaSalle and the other Lenders for whom LaSalle is agent, have incurred damages, in an amount as yet undetermined, in excess of $80 million.

TAC ¶¶ 442-43.  Under these circumstances, it was reasonably foreseeable that a material false statement in the 2002 Audit Report would injure LaSalle.  For the same reasons, LaSalle has alleged that it suffered damages.

Accordingly, the Court finds that LaSalle adequately alleges that KPMG's representations were a proximate cause of LaSalle's damages.

Having alleged adequately each of the elements of a claim for fraud under New York law, and based on the entire record, the Court concludes that the Third Amended Complaint states a claim for fraud against KPMG for the 2002 Audit.

Whether LaSalle States a Fraud Claim Against Andersen

LaSalle's Eighth Claim for Relief is for fraud against Andersen in connection with the 2001 Audit based upon gross negligence and recklessness.[10]  Andersen argues that LaSalle does

---

[10]  The Third Amended Complaint states that "[b]oth Mayer Rispler and Arthur Andersen were involved in performing the 2001 Audit which was begun in January 2001 by Mayer Rispler

not adequately allege the elements of reliance and intent.  Andersen Mem. at 17-21, 23-25.

Andersen also argues that LaSalle does not adequately allege that it intended any alleged false

representations to be communicated to the Lenders.  Andersen Mem. at 21-23.

As discussed above, the elements of a fraud claim are that the defendant made a material

false representation, the defendant intended to defraud the plaintiff thereby, the plaintiff

reasonably relied on the representation, and the plaintiff suffered damages as a result of its

reliance.  *See* pp. 17-19, *supra*.  The Court will consider these elements in turn.

### *Whether LaSalle Adequately Alleges that Andersen Made Material False Representations*

As noted above, Rule 9(b) requires that allegations of material false representations specify

the statement claimed to be fraudulent, identify the maker of the statement, state when and where

the statement was made, and explain why the statement was fraudulent.  *See* p. 58, *supra*.  *See also*

*Shields*, 25 F.3d at 1127-28.

The Third Amended Complaint states:

> On or about July 2, 2001, Arthur Andersen issued its unqualified 2001 Audit
> Report on the 2001 Financial Statements, stating, *inter alia*, that it had audited the
> Financial Statements in accordance with GAAS and that, in its opinion, the
> Financial Statements presented fairly, in all material respects, the financial
> position and results of operations and cash flows of Allou for the fiscal year then
> ended, in conformity with GAAP.

TAC ¶ 358.

LaSalle alleges that Allou's 2001 Financial Statements, which were the subject of

---

and completed by Arthur Andersen [on] July 2, 2001."  TAC ¶ 359.  The Third Amended
Complaint also states that "[i]n performing the 2001 Audit, Arthur Andersen evaluated the
services provided by Mayer Rispler . . . and elected to rely on those services as work performed
by internal auditors."  TAC ¶ 361.

Andersen's 2001 Audit Report, were materially false and misleading because, among other things:

    (a)    they grossly overstated Allou's revenues and reported grossly inflated assets, net worth, earning and cash flows;

    (b)    they grossly overstated Allou's inventory and accounts receivable thereby grossly overstating its assets, net worth, earnings and cash flows;

    (c)    they were not prepared in accordance with GAAP;

    (d)    they failed to adequately disclose the magnitude and economic substance of numerous related party transactions with the Jacobs in accordance with GAAP;

    (e)    they failed to identify and report illegal acts, including fraud, in accordance with GAAS; and

    (f)    Arthur Andersen did not conduct the 2001 Audit in accordance with AU § 150 *Generally Accepted Auditing Standards*, and other sections of GAAS, and either knew of, or recklessly disregarded, the failure to utilize sufficient audit procedures to satisfy GAAS and/or either knew of, or recklessly disregarded, the fraud at Allou. Additionally, Arthur Andersen failed to properly qualify it Audit Report in accordance with AU § 500, *The Fourth Standard of Reporting*.

TAC ¶ 362.

    LaSalle also alleges that Andersen stated in the 2001 Audit Report:

    (a)    that [it] had conducted [its] audit in accordance with [GAAS],

    (b)    that [it] had planned and performed the audit to obtain reasonable assurance about whether the financial statements were free of material misstatement, and

    (c)    that in [Andersen's] opinion the consolidated financial statements presented fairly, in all material respects, the financial position of Allou and the results of its operations and its cash flows for the year then ended, in conformity with [GAAP].

TAC ¶ 4.

LaSalle alleges that Andersen's statements were materially false because Andersen did not conduct the 2001 Audit in accordance with GAAS in that it failed:

(a)     to adequately plan its audit or to assess the risk of material misstatement,

(b)     to adequately investigate or understand (i) Allou's industry, (ii) Allou's business or operations, or (iii) Allou's financial relationships with its customers or suppliers,

(c)     to ascertain through its direct personal knowledge, obtain through physical examination, observation, computation and inspection, information relating to Allou's 2001 Financial Statements but rather relied upon information and representations provided to it by the Jacobs and Mayer Rispler as a substitute for the application of GAAS, or

(d)     to exercise appropriate professional skepticism and to obtain sufficient competent evidential matter.

TAC ¶ 390.

LaSalle further alleges that Andersen made material false statements when it stated that the 2001 Financial Statements "presented fairly, in all material respects, the financial position and results of operations and cash flows of Allou for the fiscal year then ended," because "[o]ut of the $85.6 million of reported accounts receivable . . . at March 31, 2001, approximately $35.1 million, or 41%, were fictitious," and that "millions of dollars" of the $176.4 million of reported inventory at March 31, 2001, were "fictitious."  TAC ¶¶ 358, 368, 372.

Accordingly, the Court finds that LaSalle adequately alleges that Andersen made material false representations.

### *Whether LaSalle Adequately Alleges that Andersen Acted with Fraudulent Intent*

Andersen argues that LaSalle does not adequately allege that it acted with fraudulent intent.  Andersen Mem. at 17-21; Andersen Reply Mem. at 14-20.  It argues that "mere allegations of an auditor's deviations from the standard of care, such as the conclusory allegations of the

violations of GAAP and GAAS . . . are insufficient to demonstrate the scienter necessary to state a claim for fraud, let alone plead it with particularity." Andersen Reply Mem. at 14. Andersen argues that a "pleading must allege facts showing an 'egregious refusal to see the obvious,' an 'extreme departure from the standard of care,' or 'conduct which is highly unreasonable'" and the allegations in the Third Amended Complaint "amount to at most ordinary negligence." Andersen Reply Mem. at 15.

As noted above, to state a fraud claim under New York law, against an auditor or accountant, a plaintiff must allege departures from accepted standards of practice amounting to willfulness, recklessness, or gross negligence, and must also allege that the departures caused the auditor to miss red flags or other suspicious facts and circumstances.. *See* pp. 61-62, *supra*. *See also In re CBI Holding Co.*, 247 B.R. at 367. And as discussed above, the Third Amended Complaint states a malpractice claim against Andersen for the 2001 Audit and, as an element of that claim, that Andersen departed from accepted standards of practice. *See* pp. 35-37, *supra*. A review of the Third Amended Complaint shows that it also describes specific departures from accepted standards of practice in areas including accounts receivable, inventory, and related party transactions.

<u>Alleged Departures from Standards of Practice with Respect to Accounts Receivable</u>  The Third Amended Complaint states that "[o]ut of the $85.6 million of reported accounts receivable of Allou at March 31, 2001, approximately $35.1 million, or 41%, were fictitious." TAC ¶ 368. LaSalle alleges that the "primary procedure" used by Andersen to test the existence of accounts receivable "was the confirmation of accounts selected by Mayer Rispler." TAC ¶ 369. This procedure called for the "confirmation of $80.2 million of accounts receivable that were

purportedly tested by Mayer Rispler." *Id.* However, that procedure verified only approximately $27.6 million of accounts receivable, leaving $52.6 million in unverified accounts receivable. *Id.* The Third Amended Complaint states that Mayer Rispler did not complete its testing and a "projected error based upon the entire population of reported receivables . . . was approximately $57.0 million." *Id.* LaSalle alleges that based on this projected error, Andersen "knew, or should have known, that the test could not be relied on." *Id.*

LaSalle alleges that Andersen "performed only limited testing of the work performed by Mayer Rispler, and was grossly negligent in performing that testing." TAC ¶ 370. It alleges that Andersen did not test properly for some $20.3 million in Sears and Walmart receivables outstanding as of July 12, 2001. *Id.* The Third Amended Complaint states that Andersen relied upon Allou's management's statement that "Sears and WalMart were given extended payment terms because the receivables allegedly related to merchandise to be sold during the 2001 Christmas season, and failed to conduct any further investigation." *Id.* The Third Amended Complaint states that "[a]s with the 2002 Audit, substantially all of these purported Sears and WalMart accounts receivable were fraudulent." *Id.*

The Third Amended Complaint states that approximately $41.8 million of unverified accounts receivable were related to ADI, Allou's largest entity. TAC ¶ 371. LaSalle alleges that Andersen tested proof of delivery documentation of only 22 invoices, and that this was "grossly inadequate" to support the reported accounts receivable. *Id.*

<u>Alleged Departures from Standards of Practice with Respect to Inventory</u> The Third Amended Complaint states that Allou's 2001 Financial Statements reported inventory to be $176.4 million as of March 31, 2001, when millions of dollars of the reported inventory were

fictitious.  TAC ¶ 372.  LaSalle alleges that if Andersen had "performed the tests required by AU § 331, Inventories, and other sections of GAAS for the verification of inventory balances, they would have detected substantial amounts of fraud."  TAC ¶ 375.  LaSalle alleges:

> Arthur Andersen did not perform a single physical inventory observation in connection with the 2001 Audit.  Instead, Arthur Andersen relied upon inventory observations performed by Mayer Rispler prior to the time that Arthur Andersen was engaged by Allou.  Mayer Rispler itself did not perform all of the inventory observations but, instead, arranged for yet another accounting firm . . . to perform the inventory observation at the Brooklyn warehouse, as well as observations pertaining to Direct and Stanford.

TAC ¶ 374.

LaSalle alleges that Andersen did not adequately plan the procedures to examine the observation and testing of Allou's inventory.  TAC ¶ 378.  LaSalle alleges that Andersen did not obtain Allou's entire perpetual inventory record for all the locations.  *Id*.  LaSalle also alleges that "[a]lthough Arthur Andersen apparently performed some test counts to verify the work previously performed by Mayer Rispler . . . its test counts involved only 80 out of approximately 22,000 different products and, thus, were grossly inadequate to satisfy the requirements under GAAS for evaluating the existence of inventory."  *Id*.

The Third Amended Complaint states that the inventory costing test work performed by Andersen relied primarily upon Mayer Rispler's work, and although Andersen "noted that there were material differences in costing for the same products, it failed to obtain any support to explain these differences."  TAC ¶ 379.  LaSalle allege that this violated GAAP and amounted to a failure to complete the work as required by AU §§ 330 and 350.  *Id*.  LaSalle alleges that some of the costing discrepancies involved purchases made from A&M, a related party.  TAC ¶ 380.  It alleges that the "same product purchased by Allou from A&M cost more than the same product

purchased from other suppliers." *Id*. And LaSalle alleges that this information required Andersen to "scrutinize[] these transactions more closely and perform[] additional procedures to explain these discrepancies," but that it failed to do so. *Id*.

<u>Alleged Departures from Standards of Practice with Respect to Related Party Transactions</u>

The Third Amended Complaint states that Andersen "failed to discover that Allou had dealings with numerous entities owned and/or controlled by the Jacobs . . . and that these entities were involved in various aspects of the fraud, including the bogus invoices and third-party payments." TAC ¶ 382. LaSalle alleges that rather than implementing procedures required by AU § 334 to identify related parties, Andersen merely asked the Jacobs if Allou was dealing with any related parties. *Id*.

LaSalle alleges that the 2001 Financial Statements disclose "approximately $3 million of purchases with "Ever Ready,"and "A&M," both related companies. TAC ¶ 383. "A-1 Medical" was also a related party. *Id*. The Third Amended Complaint states that "[d]uring 2001, Ever Ready, A&M and A-1 Medical 'advanced' $26 million to Allou which was not described in the [2001 Financial Statements]" and that "[t]his amount was used to mask fraudulent accounts receivable." *Id*. LaSalle alleges that Andersen did not properly perform required related party procedures and did not verify subsequent cash receipts which "would have detected Allou's accounts receivable fraud." *Id*.

Taken as a whole, LaSalle alleges departures from accepted standards of practice through conduct that was reckless or grossly negligent in areas including accounts receivable, inventory, and related party transactions. LaSalle also alleges that these departures caused Andersen to overlook several red flags and suspicious facts. *See* TAC 369-70, 379, 382-83. These include

83

allegations, among others, that Andersen relied upon a Mayer Rispler procedure designed to confirm the existence of $80.2 million of accounts receivable, even though $52.6 million of those accounts receivable were without verification and the magnitude of the projected error rendered the test unreliable.  TAC ¶¶ 369-70.  These also include allegations that Andersen accepted the statement of an Allou officer, without independent verification, that the large Sears and WalMart accounts receivable were unpaid as of June 12, 2001, because the merchandise was to be sold months later, during the 2001 Christmas season.  TAC ¶ 370.  These further include allegations that Andersen noted that material differences in the inventory costing work performed by Mayer Rispler, but did not perform any further testing.  TAC ¶ 379.  And these include allegations that Andersen did not investigate millions of dollars in related party transactions reflected in Allou's records.  TAC ¶¶ 382-83.

Accordingly, the Court finds that LaSalle adequately alleges that Andersen acted with fraudulent intent.

### *Whether LaSalle Adequately Alleges that It Reasonably Relied on Andersen's Representations*

Andersen argues that LaSalle does not adequately allege the element of reliance.  Andersen Mem. at 23-25.  Andersen asserts that "LaSalle must allege that Andersen made alleged misrepresentations with the specific intent that such misrepresentations be communicated to the Lenders for the Lenders to rely upon."  Andersen Mem. at 21.  Andersen argues that "LaSalle also must plead that each of the Lenders relied on Andersen's allegedly fraudulent audit report, and must do so with particularity."  Andersen Mem. at 23.

LaSalle argues that the allegations in the Third Amended Complaint plead each Lender's reliance on the 2001 Audit and the 2001 Financial Statements.  LaSalle Mem. at 62.  LaSalle also

argues that its allegations plead reliance with particularity.  *Id.*

As discussed above, a plaintiff must allege actual, direct reliance on the defendant's alleged misrepresentation, and the plaintiff's reliance must be reasonable under the circumstances. *See* pp. 73-74, *supra*.  At the same time, a plaintiff need not allege that the defendant intended to induce the plaintiff to act in reliance on its representation.  *See* pp. 74-75, *supra*.

LaSalle alleges that as of September 4, 2001, the initial lenders, Citibank and Congress, loaned a total of $178,627,624.83 to Allou by paying that amount to Allou's prior secured lender, Fleet National Bank.  TAC ¶ 141.  LaSalle also alleges that before extending the loan, Citibank and Congress received, among other things, Allou's 2001 Financial Statements and Andersen's 2001 Audit Report.  TAC ¶ 142.  LaSalle alleges that in deciding whether to enter into the Loan Agreement, Citibank and Congress reasonably relied upon these documents.  TAC ¶ 143.

The Third Amended Complaint states:

Arthur Andersen knew that the 2001 Audit Report and the financial information contained in the 2001 Financial Statements were intended to be used by Allou to obtain and continue financing and knew that the Lenders were receiving and relying upon the 2001 Audit Report and the 2001 Financial Statements, which were fraudulently misstated.  Allou's Form 10-K filed with the SEC for the fiscal year ended March 31, 2001, which contained the 2001 Audit Report, expressly referenced the fact that Congress had approved a $200 million credit facility for Allou.  Arthur Andersen was familiar with the terms of the Loan Agreement.

TAC ¶ 150.

And the Third Amended Complaint states that Andersen conducted reviews of Allou's Forms 10-Q filed with the SEC for the quarters ended December 31, 2000, June 30, 2001, September 30, 2001, and December 31, 2001.  TAC ¶ 153(b).  LaSalle alleges that "[a]ll of the defendants knew that the Forms 10-Q were intended to be used by Allou to obtain and continue to obtain financial accommodations."  TAC ¶ 155.  LaSalle alleges that each Subsequent Lender

reasonably relied on the 2001 Financial Statements and Andersen's 2001 Audit Report in

determining whether to extend financial accommodations to Allou.  TAC ¶ 146.

Accordingly, the Court finds that LaSalle adequately alleges that it reasonably relied upon

Andersen's representations.

### *Whether LaSalle Adequately Alleges that Andersen's Representations Proximately Caused Damages*

As noted above, to state a fraud claim under New York law, a plaintiff must allege that the

defendants's false representations were a proximate cause of its injury; that is, that its injury "was

a foreseeable consequence" of the misrepresentations.  *In re Monahan Ford Corp. of Flushing*,

340 B.R. at 32-33 (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d at 172-73).  *See* pp. 76-77,

*supra*.

> LaSalle alleges:

> Arthur Andersen knew that the 2001 Audit Report and the financial information
> contained in the 2001 Financial Statements were intended to be used by Allou to
> obtain and continue financing and knew that the Lenders were receiving and
> relying upon the 2001 Audit Report and the 2001 Financial Statements, which
> were fraudulently misstated.

TAC ¶ 150.  LaSalle also alleges that "Arthur Andersen was familiar with the terms of the Loan

Agreement, including the financial reporting provisions that required Allou to furnish audited

financial statements and Forms 10-K and 10-Q to Lenders."  *Id*.  And the Third Amended

Complaint states:

> But for Arthur Andersen's gross negligence, recklessness and fraud in connection
> with the 2001 Audit and related accounting services, the Lenders' losses would
> have been avoided or, at the very least, significantly reduced.

> As a direct and proximate result of Arthur Andersen's fraud, including fraud
> predicated upon its gross negligence and recklessness, LaSalle and the other
> Lenders for whom LaSalle is agent, have incurred damages, in an amount as yet

undetermined, in excess of $130 million.

TAC ¶¶ 445-46.  Under these circumstances, it was reasonably foreseeable that a material false statement in the 2001 Audit Report would injure LaSalle.  For the same reasons, LaSalle has alleged that it suffered damages.

Accordingly, the Court finds that LaSalle adequately alleges that Andersen's representations were a proximate cause of LaSalle's damages.

Having alleged adequately each of the elements of a claim for fraud under New York law, and based on the entire record, the Court concludes that the Third Amended Complaint states a claim for fraud against Andersen for the 2001 Audit.

## Whether LaSalle States a Fraud Claim Against Mayer Rispler

LaSalle's Ninth Claim for Relief is for fraud against Mayer Rispler in connection with the 2000 Audit based upon gross negligence and recklessness.  Mayer Rispler argues that LaSalle does not adequately allege the element of intent, and also argues that LaSalle does not adequately allege that it intended LaSalle and the Lenders to rely on the 2000 Audit.  Mayer Rispler Mem. at 18-23, Mayer Rispler Reply Mem. at 6-9.

As discussed above, the elements of a fraud claim are that the defendant made a material false representation, the defendant intended to defraud the plaintiff thereby, the plaintiff reasonably relied on the representation, and the plaintiff suffered damages as a result of its reliance.  *See* pp. 17-19, *supra*.  The Court will consider these elements in turn.

### *Whether LaSalle Adequately Alleges that Mayer Rispler Made Material False Representations*

As noted above, Rule 9(b) requires that allegations of material false representations specify the statement claimed to be fraudulent, identify the maker of the statement, state when and where

the statement was made, and explain why the statement was fraudulent.  *See* p. 58, *supra*.  *See also*

*Shields*, 25 F.3d at 1127-28.

The Third Amended Complaint states:

On or about June 19, 2000, Mayer Rispler issued its unqualified 2000 Audit Report on the 2000 Financial Statements, stating, *inter alia*, that it had audited those Financial Statements in accordance with GAAS and that, in its opinion, the Financial Statements presented fairly, in all material respects, the financial position, results of operations and cash flows of Allou for each of the years in the three year period ended March 31, 2000, in conformity with GAAP.

TAC ¶ 395.

LaSalle alleges that Allou's 2000 Financial Statements, which were the subject of Mayer

Rispler's 2000 Audit Report, were materially false and misleading because, among other things:

(a)     they grossly overstated Allou's revenues and reported grossly inflated assets, net worth, earning and cash flows;

(b)     they grossly overstated Allou's inventory and accounts receivable thereby grossly overstating its assets, net worth, earnings and cash flows;

(c)     they were not prepared in accordance with GAAP;

(d)     they failed to adequately disclose the magnitude and economic substance of numerous related party transactions with the Jacobs in accordance with GAAP;

(e)     they failed to identify and report illegal acts, including fraud, in accordance with GAAS; and

(f)     Mayer Rispler did not conduct the 2000 Audit in accordance with AU § 150 *Generally Accepted Auditing Standards*, and other sections of GAAS, and either knew of, or recklessly disregarded, the failure to utilize sufficient audit procedures to satisfy GAAS and/or either knew of, or recklessly disregarded, the fraud at Allou.  Additionally, Mayer Rispler failed to properly qualify its Audit Report in accordance with AU § 500, *The Fourth Standard of Reporting*.

TAC ¶ 397.

LaSalle also alleges that Mayer Rispler stated in the 2000 Audit Report:

(a)     that [it] had conducted [its] audit in accordance with [GAAS],

(b)     that [it] had planned and performed the audit to obtain reasonable assurance about whether the financial statements were free of material misstatement, and

(c)     that, in [Mayer Rispler's] opinion, the consolidated financial statements presented fairly, in all material respects, the financial position of Allou and the results of its operations and its cash flows for the year then ended, in conformity with [GAAP].

TAC ¶ 4.

LaSalle alleges that these statements were materially false because Mayer Rispler did not

conduct the 2000 Audit in accordance with GAAS in that it failed:

(a)     to adequately plan its audit or to assess the risk of material misstatement,

(b)     to adequately investigate or understand (i) Allou's industry, (ii) Allou's business or operations, or (iii) Allou's financial relationships with its customers or suppliers,

(c)     to ascertain through its direct personal knowledge, obtain through physical examination, observation, computation and inspection, information relating to Allou's 2000 Financial Statements but rather relied upon information and representations provided to it by the Jacobs as a substitute for the application of GAAS, or

(d)     to exercise appropriate professional skepticism and to obtain sufficient competent evidential matter.

TAC ¶ 419.

LaSalle further alleges that Mayer Rispler made material false statements when it stated

that the 2000 Financial Statements "presented fairly, in all material respects, the financial position,

and results of operations and cash flows of Allou for each of the years in the three year period

ended March 31, 2000," because "[o]ut of the $75.8 million of reported accounts receivable . . . at

89

March 31, 2000, approximately $25.0 million or 33%, was fictitious", and that "millions of dollars of Allou's reported inventory were non-existent or materially overvalued."  TAC ¶¶ 395, 403, 409.

Accordingly, the Court finds that LaSalle adequately alleges that Mayer Rispler made material false representations.

### *Whether LaSalle Adequately Alleges that Mayer Rispler Acted with Fraudulent Intent*

Mayer Rispler argues that LaSalle does not adequately allege that it acted with fraudulent intent.  Mayer Rispler Mem. at 21-24; Mayer Rispler Reply Mem. at 8-9.  It argues that LaSalle's allegations of intent are not pled with the requisite particularly and that LaSalle "relies on conclusions to support its allegations of fraud."  Mayer Rispler Reply Mem. at 9.

As noted above, to state its fraud claim under New York law, LaSalle must allege departures from accepted standards of practice amounting to willfulness, gross negligence, or recklessness, and also must allege that the departures caused the auditor to miss red flags or other suspicious circumstances.  *See* pp. 61-62, *supra*.  *See also In re CBI Holding Co.*, 247 B.R. at 367. And as discussed above, the Third Amended Complaint states a malpractice claim against Mayer Rispler for the 2000 Audit and, as an element of that claim, that Mayer Rispler departed from accepted standards of practice.  *See* pp. 48-50, *supra*.  A review of the Third Amended Complaint shows that it also describes specific departures from accepted standards of practice in areas including accounts receivable, inventory, and related party transactions.

Alleged Departures from Standards of Practice with Respect to Accounts Receivable  The Third Amended Complaint states that "[o]ut of the $75.8 million of reported accounts receivable of Allou at March 31, 2000, approximately $25.0 million or 33% was fictitious."  TAC ¶ 403.

LaSalle alleges that the "primary procedure" used by Mayer Rispler to test the existence of

accounts receivable "was to send written confirmation requests to Allou's customers."  TAC

¶ 404.  LaSalle alleges that "when the customers failed to respond to the request, additional

procedures were required to be performed . . . [h]owever, . . . these additional procedures were not

performed or, to the extent they were performed at all, were recklessly mishandled."  *Id*.

> LaSalle alleges:

> Mayer Rispler performed a test of subsequent cash collections (*i.e.*, the March 31,
> 2000 balances that were collected through the end of audit field work) and found
> that approximately $24.5 million had not been collected.  Included in these
> uncollected receivables were $9.4 million reported as due from Sears and $13.7
> million reported as due from WalMart, all of which were fictitious.  Had Mayer
> Rispler performed the requisite procedures to test accounts receivable, the fraud
> would have been discovered.

TAC ¶ 405.

In addition, the Third Amended Complaint states that Mayer Rispler "accepted the 'special

dating' explanation for $24.5 million in uncollected accounts receivable without any of the

required evidential support.  In view of the materiality of the amounts in question, Mayer Rispler

was grossly negligent and reckless in not performing additional procedures to investigate these

receivables."  TAC ¶ 406.

Alleged Departures from Standards of Practice with Respect to Inventory  The Third

Amended Complaint states that the "procedures performed by Mayer Rispler failed to detect

millions of dollars of fraudulent inventory."  TAC ¶ 407.  LaSalle alleges that "instead of

observing the May 11, 2000 physical inventory of the Brooklyn warehouse as required under AU

§ 312 and AU § 331, Mayer Rispler elected to perform test counts on May 17, 2000."  *Id*.  It

alleges that these test counts were flawed.  The Third Amended Complaint states:

These test counts included seven fraudulent balances with a combined balance of $6.6 million and per-unit costs ranging from $16.25 to $31. These seven fraudulent balances were counted as a combined group rather than on an individual basis. Accordingly, Mayer Rispler's existence procedure paid no attention to product numbers or product descriptions. More importantly, because of the way Mayer Rispler counted the seven balances, it could not determine if ADI made an approximate $1.4 million costing error or if potentially overstocked products were omitted from net realizable value analyses.

Mayer Rispler did perform a rollback analysis of ADI's May 1, 2000 physical inventory, but did not verify underlying transactions included in the rollback. Included in the rollback are $8.3 million of adjustments that reduced ADI's March 31, 2000 inventory. Although these adjustments could indicate a potential material misstatement to Allou's March 31, 2000 consolidated financial statements, Mayer Rispler failed to investigate them.

TAC ¶¶ 407-08.

<u>Alleged Departures from Standards of Practice with Respect to Related Party Transactions</u>

The Third Amended Complaint states that "Mayer Rispler knew that Allou had dealings with numerous entities owned and/or controlled by the Jacobs and members of their families." TAC ¶ 410. LaSalle alleges that Mayer Rispler provided professional services to "Mom & Sons Realty, Ever Ready, Four Jacobs Realty and A-1 Medical, all of which are related parties that participated in the fraud." *Id*. LaSalle alleges that Mayer Rispler did not implement procedures specified in AU § 334 to identify related parties, evaluate the economic substance of the transactions with the related parties, and provide appropriate disclosures in Allou's financial statements. *Id*.

The Third Amended Complaint states that the 2000 Financial Statements disclose some $12 million of related party purchases during the year ended March 31, 2000. TAC ¶ 411. LaSalle alleges that "[d]uring 2000, [the related entities] Ever Ready, A&M and A-1 Medical 'advanced' $8 million to Allou and this amount was used to mask fraudulent accounts receivable." *Id*. LaSalle alleges that had the specific related party procedures been implemented by Mayer

Rispler, the accounts receivable fraud would have been detected.  *Id.*

Taken as a whole, LaSalle alleges departures from accepted standards of practice through conduct that was reckless or grossly negligent in areas including accounts receivable, inventory, and related party transactions.  LaSalle also alleges that these departures caused Mayer Rispler to overlook several red flags and suspicious facts.  *See* TAC ¶¶ 405-06, 408, 410-11.  These include allegations, among others, that Mayer Rispler accepted, without appropriate additional testing, the explanation of Allou's management that some $24.5 million in uncollected accounts receivable, including $9.4 from Sears and $13.7 million from WalMart, required "special dating."  TAC ¶¶ 405-06.  These also include allegations that Mayer Rispler did not investigate $8.3 million in adjustments to Allou's physical inventory which could indicate a material misstatement in the March 31, 2000, Financial Statements.  TAC ¶ 408.  And these include allegations that Mayer Rispler ignored the fact that it provided professional services to several entities that were owned or controlled by the Jacobs, and neither investigated the substance of Allou's transactions with those entities nor provided for appropriate disclosures in Allou's financial statements.  TAC ¶ 410-11.

Accordingly, the Court finds that the LaSalle adequately alleges that Andersen acted with fraudulent intent.

### *Whether LaSalle Adequately Alleges that It Reasonably Relied on Mayer Rispler's Representations*

Mayer Rispler argues that LaSalle does not adequately allege the element of reliance.  Mayer Rispler Reply Mem. at 6-8.  Mayer Rispler argues that "LaSalle does not, and cannot, allege that Mayer Rispler intended that its 2000 audit report be conveyed to or relied on by LaSalle and its co-Lenders" because "[a]t that time, Allou's lenders were a consortium of banks

led by Fleet Capital Corp." Mayer Rispler Reply Mem. at 7. Mayer Rispler asserts that "[a]t most, Mayer Rispler can be presumed to have intended that Fleet and its co-lenders rely on the 2000 audit." *Id.* Mayer Rispler Mem. at 18-20.

LaSalle argues that the allegations in the Third Amended Complaint sufficiently plead each Lender's reliance on the 2000 Audit and the 2000 Financial Statement. LaSalle Mem. at 62. LaSalle also argues that its allegations plead reliance with particularity. *Id.*

As discussed above, a plaintiff must allege actual, direct reliance on the defendant's alleged misrepresentation that is reasonable under the circumstances. *See* pp. 73-74, *supra*. At the same time, a plaintiff need not allege that the defendant intended to induce the plaintiff to act in reliance on its representation. *See* pp. 74-75, *supra*.

LaSalle alleges that as of September 4, 2001, the initial lenders, Citibank and Congress, loaned a total of $178,627,624.83 to Allou by paying that amount to Allou's prior secured lender, Fleet National Bank. TAC ¶ 141. LaSalle also alleges that before extending the loan, Citibank and Congress received, among other things, Allou's 2000 Financial Statements and Mayer Rispler's 2000 Audit Report. TAC ¶ 142. LaSalle alleges that in deciding whether to enter into the Loan Agreement, Citibank and Congress reasonably relied upon these documents. TAC ¶ 143.

The Third Amended Complaint states:

At the time Mayer Rispler issued the 2000 Audit Report, Allou was receiving financing pursuant to a financing agreement with a consortium of banks led by Fleet Capital Corp. which provided Allou with a line of credit in the amount of $163.5 million (the "Fleet Loan Facility"). The Fleet Loan Facility was replaced by the loan facility established under the Loan Agreement and . . . was repaid at the closing of the Loan Agreement on or about September 4, 2001.

Mayer Rispler knew that the 2000 Audit Report and the financial information contained in the 2000 Financial Statements were intended to be used by Allou to obtain and continue such financing and knew that the lender under the Fleet Loan

> Facility and any successor lenders would be receiving and relying upon the 2000
> Audit Report and the 2000 Financial Statements, which were fraudulently
> misstated.

TAC ¶¶ 147-48.

And the Third Amended Complaint states that Mayer Rispler assisted in the preparation of or reviewed Allou's Forms 10-Q filed with the SEC for the quarters ended December 31, 2000, June 30, 2001, September 30, 2001, December 31, 2001, June 30, 2002, September 30, 2002, and December 31, 2002. TAC ¶ 153(a). LaSalle alleges that "[a]ll of the defendants knew that the Forms 10-Q were intended to be used by Allou to obtain and continue to obtain financial accommodations." TAC ¶ 155. LaSalle alleges that each Subsequent Lender reasonably relied on the 2000 Financial Statements and Mayer Rispler's 2000 Audit Report in determining whether to extend financial accommodations to Allou. TAC ¶ 146.

Accordingly, the Court finds that LaSalle adequately alleges that it reasonably relied upon Mayer Rispler's representations.

### _Whether LaSalle Adequately Alleges that Mayer Rispler's Representations Proximately Caused Damages_

As noted above, New York law requires a plaintiff asserting a fraud claim to allege that it sustained an injury that was proximately caused by the defendant's false representation. The allegations must show that the injury was "a foreseeable consequence" of the misrepresentations. _In re Monahan Ford of Flushing_, 340 B.R. at 32-33 (citing _Lentell_, 396 F.3d at 172-73).

LaSalle alleges:

> Mayer Rispler knew that the 2000 Audit Report and the financial information
> contained in the 2000 Financial Statements were intended to be used by Allou to
> obtain and continue such financing and knew that the lender under the Fleet Loan
> Facility and any successor lenders would be receiving and relying upon the 2000
> Audit Report and the 2000 Financial Statements, which were fraudulently

95

misstated.

TAC ¶ 148.  LaSalle also alleges that "Mayer Rispler thereafter became aware of, and familiar with, the terms of the Loan Agreement, including the financial reporting provisions that required Allou to furnish audited financial statement and Forms10-K and 10-Q to the Lenders."  TAC ¶ 149. And the Third Amended Complaint states:

> But for Mayer Rispler's gross negligence, recklessness and fraud in connection with the 2000 Audit and related accounting services, the Lenders' losses would have been avoided or, at the very least, significantly reduced.
>
> As a direct and proximate result of Mayer Rispler's fraud, including fraud predicated upon its gross negligence and recklessness, LaSalle and the other Lenders for whom LaSalle is agent, have incurred damages, in an amount as yet undetermined, in excess of $130 million.

TAC ¶¶ 448-49.  Under these circumstances, it was reasonably foreseeable that a material false statement in the 2000 Audit Report would injure LaSalle.  For the same reasons, LaSalle has alleged that it suffered damages.

Accordingly, the Court finds that LaSalle adequately alleges that Andersen's representations were a proximate cause of LaSalle's damages.

Having alleged adequately each of the elements of a claim for fraud under New York law, and based on the entire record, the Court concludes that the Third Amended Complaint states a claim for fraud against Mayer Rispler for the 2000 Audit.

## **CONCLUSION**

For the reasons stated herein, and based on the entire record, the Motions to Dismiss are denied. An order in accordance with this Memorandum Decision will be entered simultaneously herewith.

Dated: Brooklyn, New York
        September **_29_**, 2008

                              _S/Elizabeth S. Stong_
                              ELIZABETH S. STONG
                              UNITED STATES BANKRUPTCY JUDGE